**PANORAMIC STUDIOS, INC.**

**v.**

**The UNITED STATES.**

**No. 278–67.**

United States Court of Claims.

July 16, 1969.

Theodore M. Kostos, Philadelphia, Pa., for plaintiff, Stassen, Kephart, Sarkis & Kostos, Philadelphia, Pa., of counsel.

R. W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make recommendation for conclusions of law on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c). The commissioner has done so in an opinion and report filed on January 14, 1969, wherein such facts as are necessary to the opinion are set forth. Plaintiff requested review of the commissioner's opinion and recommended conclusion of law and the case has been submitted on oral argument of counsel and the briefs of the parties.

With respect to the termination claim, this case is to be distinguished on its facts from DeVito, Receiver v. United States, Ct.Cl., 413 F.2d 1147, likewise decided today. Here the contractor did nothing substantial toward performance from the end of August, 1965 to the end of April, 1966, and the Government did not by its conduct lead the contractor to believe that continued performance was expected.

On the breach-of-contract issue, the plaintiff contends that the principle of Helene Curtis, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963), and similar decisions, applies not only where the Government withholds necessary information prior to the making of the contract, but also where it with-

holds such information which it learns for the first time during performance. For a number of reasons we do not decide that issue in this case. The administrative record was not at all directed to that point and accordingly does not permit of a proper answer. Plaintiff did not ask for a *de novo* trial on the issue until the oral argument before the court, when it did so belatedly. We decline, however, to exercise our discretion to require a *de novo* trial at this late stage, especially since plaintiff has not given us any reason for believing that it could not have been expected to make inquiry on its own, in the course of performance, as to the process it now says the defendant learned about and did not tell plaintiff.*

Since the court agrees with the commissioner's opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, together with the above, as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is allowed, and the petition is dismissed.

## OPINION OF COMMISSIONER

WHITE, Commissioner: The plaintiff complains in the present case that the defendant acted wrongfully in partially terminating a contract (No. AF 23(601)–4034) between the parties, and also that the defendant breached such contract by failing to furnish to the plaintiff certain information known to the defendant.

Contract No. AF 23(601)–4034 ("the contract") contained the usual "disputes," "default," and "termination for convenience" provisions. Under those provisions, the matter of the defendant's partial termination of the contract because of alleged default on the part of the plaintiff has heretofore been the subject of administrative proceedings, which culminated in a decision that was rendered by the Armed Services Board of Contract Appeals on April 28, 1967 (ASBCA No. 11559) and was adverse to the plaintiff. In the present action, the plaintiff attacks the administrative decision of April 28, 1967 on the ground that three questions were erroneously decided by the Board.

The administrative record has been filed with the court; and the parties have submitted cross-motions for summary judgment on the basis of the pleadings and the administrative record. The plaintiff has not requested a trial *de nova* on its claim requesting an alleged breach of contract.

It is my opinion that the plaintiff is not entitled to recover.

The contract was awarded to the plaintiff on May 22, 1964 by the defendant (represented by a contracting officer of the Aeronautical Chart and Information Center, Department of the Air Force), following a competitive bidding procedure. It provided for the preparation by the plaintiff and delivery to the defendant of a radar map set (RMS No. 118), consisting of eight separate items, for a total price of $79,363.

The invitation for bids on the contract had instructed bidders to submit separate bids on the eight separate items that were to comprise the radar map set, but bidders had been informed that they must bid on an "all or none" basis and that the contract would be awarded to the responsible bidder whose bids on all eight items combined to make the lowest total. It was on this basis that the total of $79,363 quoted by the plaintiff on all eight items of the radar map set obtained the contract for the plaintiff.

The eight items of the radar map set, and the prices which the plaintiff was to receive under the contract for the prep-

---

* The claim that the defendant failed to supply promised radar information was not properly raised by the plaintiff before the Trial Commissioner, and therefore we do not consider it.

aration and delivery of the several items, were as follows:

| | | |
|---|---|---|
| a. | Basic Compilation | $30,399 |
| b. | Master Model | 16,881 |
| c. | Negative Master Mold | 2,400 |
| d. | Relief Model | 5,114 |
| e. | Planar Map | 14,875 |
| f. | Cross Country Slide Compilation | 3,687 |
| g. | Target Approach and Extended Target Approach Compilation | 1,400 |
| h. | Projection Slide Set | 4,107 |
| | Total | $79,363 |

The end products sought by the defendant under the contract were the projection slide set, the relief model, and the planar map, which were to be used in the F–105D Simulator-Trainer System. The other five items of the radar map set were needed to produce the projection slide set, the relief model, and the planar map.

The purpose of the simulator mentioned in the preceding paragraph was to familiarize a pilot with the instrumentation of the F–105D aircraft, to develop his ability to identify terrain rapidly by viewing a radar scope, and to familiarize him with a target mission. The simulator used the projection slide set, the relief model, and the planar map to produce a radar image. The relief model and the planar map were held in an upright position, facing each other, by a metal frame or gantry, with a scanning device moving in the space between them. As the pilot took the aircraft on its simulated mission, its course was recorded on the slides. Projection of these paths on the appropriate map image enabled the instructor to monitor the mission in progress.

Under the original provisions of the contract, all eight items of the radar map set were to be delivered to the defendant within 150 days from the date of the award (May 22, 1964). However, because of the defendant's failure to deliver to the plaintiff certain government-furnished property in accordance with the schedule set out in the contract specifications, the contract was amended in November 1964 to revise the delivery schedule. Under the revised schedule, item a was to be delivered by September 14, 1964; item e was to be delivered by November 9, 1964; items f, g, and h were to be delivered by December 30, 1964; and items b, c, and d were to be delivered by January 4, 1965.

The revised delivery schedule referred to in the preceding paragraph was met by the plaintiff with respect to items a, b, e, f, and g. Those five items were inspected, accepted, and paid for by the defendant. The payments aggregated $65,324. The present action does not involve the five items mentioned in this paragraph.

The plaintiff did not, however, deliver the projection slide set (item h) by December 30, 1964, and did not deliver the negative master mold (item c) or the relief model (item d) by January 4, 1965. Accordingly, the contracting officer issued a "delinquency notice" to the plaintiff on January 5, 1965. This notice stated as follows:

1. You are hereby notified that you have failed to comply with the delivery schedule of Contract AF 23(601)–4034. As a result of your failure to perform you are considered delinquent.

2. Based upon the latest production information available and the Government's urgent need for the supplies, the Government, at this time, is withholding invoking its rights under the "default" clause and any other provisions of the contract, until further notice to you or until the delinquency is rectified, whichever occurs first.

3. The fact that the Government is refraining from asserting its contractual rights at this time shall in no way be considered as a waiver of these rights. Any assistance rendered to the Contractor on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part

of the Government to condone any delinquency. All rights which the Government now has, or which will inure to the Government, because of your delinquency, are hereby expressly reserved by the Government.

On January 12, 1965, the plaintiff replied to the "delinquency notice." In doing so, the plaintiff stated that "the delay in delivery is in substantial part due to the Air Force," and that "we in turn expressly reserve the right to seek redress for the damages and delays imposed on us."

Thereafter, the contracting officer further extended the delivery dates for the projection slide set, the negative master mold, and the relief model on two separate occasions. The final date fixed for delivery of the items in the second extension was March 9, 1965.

On March 3, 1965, a relief model (item *d*) that had been prepared by the plaintiff was inspected by the defendant and was rejected. The rejection was confirmed by a letter dated March 5, 1965 from the contracting officer to the plaintiff, stating in part as follows:

2. You were given a notice of rejection of the Final Relief Model * * on 3 March 1965 * * *. In conjunction with the rejection of the Relief Model, the Master Mold * * * is also rejected.

* * * * * *

8. Request you furnish the undersigned with a complete report of your proposed action to correct the deficiencies that now exist on the Relief Model, RMS #118, within ten (10) days after receipt of this letter. You are to include in the report, the date on which you will be ready for reinspection and delivery date.

It will be noted that the negative master mold (item *c*), from which the relief model had been cast, was also rejected by the contracting officer in the letter dated March 5, 1965.

On March 17, 1965, the plaintiff replied to the contracting officer's letter of March 5, 1965. The plaintiff stated

that "we dispute the basis indicated * * * for the rejection of the final relief model," requested "that you reconsider this matter," and suggested that an "on-the-spot review" be held at the plaintiff's plant. The plaintiff further stated that "In the meantime, we are proceeding to make the directed corrections and changes."

Thereafter, by means of a letter dated March 24, 1965, the contracting officer requested that the plaintiff specifically report its correction plans. The plaintiff submitted the requested report under the date of April 2, 1965.

In a letter dated May 3, 1965, the plaintiff informed the contracting officer that it was scheduling the radar map set "for completion in 6 weeks." The contracting officer responded on May 7, 1965 by informing the plaintiff in part as follows:

1. You are hereby notified that the Government will withhold default action * * * of subject contract until 14 June 1965 * * * to allow you to complete performance * * *, so long as you continue to make progress towards its completion by that date. In the event you fail to deliver within this time, termination action may be initiated without further notice. Moreover, the Government reserves all rights under General Provision No. 11 (Default) and at law.

On June 14, 1965, there was an inspection by the defendant's personnel of a newly constructed second relief model, and it was rejected.

On June 23, 1965, the contracting officer sent to the plaintiff a "show cause" letter, which stated in part as follows:

1. You are hereby notified that since you have failed to perform Contract No. AF 23(601)–4034 within the time required by or terms thereof, the Government is considering terminating said contract pursuant to General Provision No. 11 (Default). Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of caus-

es beyond your control and without fault or negligence on your part. Accordingly, you are hereby afforded the opportunity to present, in writing, any facts bearing on the question * * * within ten (10) days after receipt of this notice. Failure of the Contractor to present any excuses within this time may be considered as an admission that none exist. Your attention is invited to the respective rights of the Contractor and the Government under General Provision No. 11 (Default) and the liabilities that may be invoked in the event a decision is made to terminate for default of the Contractor.

The plaintiff replied on July 1, 1965 to the contracting officer's "show cause" letter, and stated in part as follows:

We respectfully submit that there has been no failure whatsoever on the contractor's part to perform in accordance with the requirements of the contract. We strongly dispute that any grounds exist which entitle the Government to terminate the contract for default. In particular, the relief model has been completed and, in our judgment, fully complies with the requirements of the contract. This item was completed within the time period agreed upon by both parties. The relief model was rejected even though in our judgment it fully complies with the contract requirements.

\* \* \* \* \* \*

\* \* \* [I]t is the position of the contractor that there is no default or delinquency in this matter and that the relief model has been completed on time and in accordance with contract requirements. \* \* \*

Thereafter, obstensibly in response to the plaintiff's assertions in its letter of July 1, 1965 that it had corrected the relief model and that the relief model had been made suitable for acceptance, the contracting officer scheduled another inspection at the plaintiff's plant for August 16, 1965. As scheduled, the relief model was again inspected at the plaintiff's plant on August 16, 1965. At that time, the item was again rejected on the ground that the major defects which caused the rejection of the relief model in June—i. e., incorrect radar portrayal and failure to comply with the bow tolerance—had not been corrected.

In a letter dated August 17, 1965 and addressed to the contracting officer, the plaintiff requested "that the Contracting Officer exercise his own independent judgment to accept the relief model," and expressed the belief "that acceptance of the relief model is in the best interest of the Government and is required by contract and by any standard of fairness."

No reply having been received by the plaintiff to its letter of August 17, 1965, the plaintiff again wrote to the contracting officer on September 22, 1965, stating (among other things) that "Your advice on the current status of this situation would be appreciated." The Air Force's termination contracting officer responded to the plaintiff's letter of September 22 on October 7, 1965, and stated in part as follows:

3. Pending completion of the current review and evaluation by Hq USAF, final action cannot be taken on subject contract.

On November 2, 1965, the plaintiff wrote a letter to the Comptroller General of the United States, protesting against the actions taken by personnel of the defendant under the contract. The Comptroller General responded in a letter dated February 15, 1966 (B–157213), which stated in part as follows:

\* \* \* In our judgment the matter constitutes essentially a dispute on a question of fact which should be disposed of initially under the procedure established in the "Disputes" clause of the contract before we would be authorized to consider the merits of your protest. The basis for this conclusion is set forth in the attached copy of our letter of today to the Secretary of the Air Force.

Subsequently, on April 29, 1966, the termination contracting officer sent to the plaintiff a telegram that partially terminated the contract as to the three undelivered items. The telegram stated in part as follows:

* * * THE UNDERSIGNED CONTRACTING OFFICER NOW FINDS AND DETERMINES THAT YOUR FAILURE TO DELIVER AN ACCEPTABLE RELIEF MODEL (ITEM 1d) AND NEGATIVE MASTER MOLD (ITEM 1c) AND YOUR ABANDONMENT OF PERFORMANCE ON THE PROJECTION SLIDE SET (ITEM 1h) DID NOT ARISE OUT OF CAUSES BEYOND YOUR CONTROL OR WITHOUT YOUR FAULT OR NEGLIGENCE. THEREFORE, YOU ARE HEREBY NOTIFIED THAT THE GOVERNMENT, BY THIS WRITTEN NOTICE TERMINATES SUBJECT CONTRACT, INCLUDING YOUR RIGHT TO PROCEED WITH PERFORMANCE THEREUNDER, IN ITS ENTIRETY FOR DEFAULT UNDER GENERAL PROVISION 36c OF THE CONTRACT EFFECTIVE IMMEDIATELY ON RECEIPT OF THIS NOTICE. * * *

The plaintiff took a timely appeal to the Armed Services Board of Contract Appeals from the action of the termination contracting officer in partially terminating the contract. After a hearing was held in Philadelphia, Pennsylvania, during late November and early December of 1966, the Board rendered a decision on April 28, 1967 (ASBCA No. 11559), denying the appeal.

The present action in this court was subsequently instituted by the plaintiff on August 24, 1967.

### The Waiver Issue

One of the questions presented to the Armed Services Board of Contract Appeals in the administrative proceedings was whether the long delay on the part of the defendant in partially terminating the contract as to the relief model—

after the inspection and rejection of the relief model on August 16, 1965—constituted a waiver of the delivery schedule as to that item. The Board answered this question in the negative stating in part as follows:

* * * [I]t is clear to us that the Government's failure to terminate for a long period of time after its last rejection did not constitute an election to permit delayed performance but was merely a forbearance to terminate while appellant [plaintiff] was attempting to secure relief from sources other than the contracting officer.

The first error attributed to the Board's decision of April 28, 1967 by the plaintiff in the petition relates to the quotation set out in the preceding paragraph of this opinion.

In this connection, it will be noted from the summary of the facts previously set out in this opinion that the final date fixed in the contract, by formal amendment, for the delivery of the relief model (and the other undelivered items) was March 9, 1965.

■■ The parties appear to agree in their briefs that if a Government contractor fails to deliver a contracted-for item on the agreed delivery date, and the Government thereafter permits the contractor to continue performance, the Government will be deemed to have waived the agreed-upon delivery date; and that a termination for default cannot properly be effected until a new delivery date is set and the contractor fails to make delivery on or before the new date. Generally, an election to permit a contractor to continue performance beyond the agreed-upon delivery date occurs when the conduct of the Government "reasonably indicates a manifestation of intention to permit continuation of performance." Cuneo, Waiver of the Due Date in Government Contracts, 43 Va.L.Rev. 1, 29 (1957).

Under this standard, it seems to be clear from the summary of the facts previously recited that the defendant waived the March 9, 1965 delivery date

for the relief model and fixed June 14, 1965 as a new delivery date. Perhaps August 16, 1965 was, by implication, set as still another delivery date for the relief model. In any event, an acceptable relief model was not furnished to the defendant on or before August 16, 1965.

After the inspection and rejection of the relief model on August 16, 1965, the record does not reveal any action by the defendant that the plaintiff could reasonably have construed as manifesting an intention on the part of the defendant to permit the continuation of performance as to the relief model. Certainly, by October 7, 1965, the plaintiff was aware that the defendant was undertaking a "review and evaluation" of the contract with a view to possible termination (since the letter of October 7, 1965 to the plaintiff was from the Air Force's termination contracting officer).

The plaintiff then sought relief from the Comptroller General, and that official did not respond until February 15, 1966. The formal termination notice was thereafter issued on April 29, 1966. In the meantime, nothing was done by the defendant that could reasonably have led the plaintiff to believe that the defendant intended for the plaintiff to continue working on the relief model.

Accordingly, the Armed Services Board of Contract Appeals did not err in deciding that as of April 29, 1966—the termination date—there was no waiver in effect respecting the delivery schedule for the relief model.

The plaintiff urges that a communication which the contracting officer sent to the plaintiff on July 7, 1965 has a bearing on the question of the waiver of the delivery date as to the relief model. That communication stated in part as follows:

2. Pending a final decision on our Request for Termination for Default of subject contract, the Termination Contracting Officer has recommended that you be advised to continue with the work on the Projection Slide Set, Item 1h. of the contract.

3. Any assistance rendered to the Contractor on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract.

It will be noted, however, that the communication of July 7, 1965 related only to the continuation of work on the projection slide set (item $h$) and specifically notified the plaintiff that it was not to be construed as an intention on the part of the defendant to condone any delinquency—or as a waiver of any rights which the defendant might have respecting any delinquency—as to other undelivered items under the contract. It is also pertinent to note in this connection that the parties are in agreement that each item of the contract was subject to individual inspection, acceptance, and payment. Therefore, in spite of the fact that the projection slide set would have been useless to the defendant without the relief model, it was not reasonable for the plaintiff to interpret the defendant's communication of July 7, 1965, which addressed itself solely to the projection slide set, as a direction to continue working on the relief model and as a waiver of the delivery date respecting the relief model. Only the delivery date for the projection slide set was waived by the defendant's communication of July 7, 1965.

It is true that a substantial period of time elapsed between the final rejection of the relief model on August 16, 1965 and the partial termination of the contract on April 29, 1966. However, the evidence fails to show that the plaintiff continued to work on the relief model after August 16, 1965 in reliance on the lack of official action by the defendant to terminate the contract as to this item, or that the plaintiff otherwise incurred substantial losses respecting the relief model after August 16, 1965

in reliance upon the defendant's non-action. Rather, it seems clear from the evidence in the record that the plaintiff, being cognizant of the defendant's apparent disposition to terminate the contract as to the relief model, endeavored to secure relief from the Comptroller General, and that the defendant, being aware of such effort, delayed the partial termination of the contract pending the outcome of the plaintiff's approach to the Comptroller General.

### The Abandonment Issue

The second error attributed by the petition to the administrative decision of April 28, 1967 relates to the Board's determination that:

* * * [A]ppellant [plaintiff] abandoned its right to perform on the slide set after the prior waiver.

As indicated earlier in this opinion, one of the end products sought by the defendant under the contract was a projection slide set (item *h*). The task of producing the compilations for the projection slide set was subcontracted by the plaintiff to Air Survey Corporation, of Arlington, Virginia. Other—and more important—aspects of the contract relating to the production of the projection slide set were subcontracted to Ling-Tempco-Vought, Inc., of Dallas, Texas.

The evidence indicates that an initial inspection of the slides in February 1965 resulted in their rejection, although it appears that such rejection was partially the result of the defendant's failure to provide the plaintiff with complete compilation information in accordance with a requirement of the contract.

In a letter which the plaintiff sent to the contracting officer on June 29, 1965 —after the issuance of the "show cause" letter of June 23, 1965 to the plaintiff by the contracting officer—inquiry was made as to whether the possible initiation of termination proceedings meant that the plaintiff should "stop all work immediately, particularly on the slides." The letter further stated that the plaintiff would await an answer for one week, and that in the absence of a reply to the contrary, it would be assumed by the plaintiff that the defendant intended for the plaintiff to continue the work on the projection slide set. The contracting officer's reply to this inquiry was dated July 7, 1965, and it has already been partially quoted in a preceding part of this opinion. The reply advised the plaintiff "to continue with the work on the Projection Slide Set * * *."

The evidence indicates that although the delayed compilation information which the defendant was to furnish the plaintiff in connection with the production of the projection slide set had been provided by July 1965, the plaintiff did not do any further work on the projection slide set during the period between July 1965 and April 29, 1966, despite the contracting officer's advice of July 7, 1965 to proceed with that work.

The plaintiff asserts in its brief that since the projection slide set was useless to the defendant if the final relief model should ultimately be found by the defendant to be unacceptable, and since the completion of the projection slide set would have required only from 7 to 10 days of additional work after the receipt of advice to proceed with that work, the plaintiff "chose to refrain from giving LTV [Ling-Tempco-Vought, the subcontractor] the go-ahead on it until some sort of determination was made with regard to the acceptance of the final relief model." Hence, the plaintiff contends that the Armed Services Board of Contract Appeals erred in determining that the plaintiff had abandoned its right to produce the projection slide set under the contract.

█ It has previously been noted in this opinion that both parties are in agreement that each item to be produced under the contract was subject to individual inspection, acceptance and payment. Indeed the evidence clearly shows that prior to April 29, 1966, five of the items under the contract had been produced by the plaintiff and had been inspected, accepted, and paid for by the

defendant. Therefore, the uncertainty in July 1965 and thereafter as to whether the contract would be terminated respecting the relief model did not constitute any justification for the plaintiff's failure to proceed with the work on the projection slide set in response to the contracting officer's specific advice of July 7, 1965 that the plaintiff should continue with such work.

In view of the plaintiff's failure to do any work on the projection slide set between July 7, 1965 and April 29, 1966, despite the contracting officer's specific advice that such work should proceed, the Armed Services Board of Contract Appeals did not err in determining that as of April 29, 1966 the plaintiff had abandoned its right to produce the projection slide set under the contract.

*The Lack-of-Inspection Issue*

As the third error attributed by the petition to the administrative decision of April 28, 1967, it is asserted that the Board erred "in finding that the Government could terminate for default the Negative Mold."

In this connection, the petition alleges that the negative master mold (item *c*) was completed and tendered for inspection by March 1965, but that it was never inspected by the defendant up to the time (April 29, 1966) when the contract was terminated as to the mold.

The negative master mold was supposed to be a negative duplicate of the master model (item *b*), of which it was designed to furnish copies. The defendant accepted the master model on December 30, 1964, and paid the plaintiff for it.

The plaintiff produced the negative master mold by means of an intricate process which involved the application of thin "release coats" to the master model, with epoxy plastic resin subsequently poured or sprayed thereon. To assure its durability, the negative master mold created by this process was then strengthened.

Under the contract, the plaintiff was required to make only one cast from the negative master mold, this cast being the contract item previously referred to as the relief model (item *d*). However, the contract specifications required that the negative master mold be capable of producing a total of eight casts.

Thus, the successful production of the negative master mold was essential to the production of a satisfactory relief model and to the over-all usefulness of the radar map set.

The evidence in the record indicates that the plaintiff completed the negative master mold and tendered it for inspection sometime prior to March 5, 1965; and that the contracting officer, without the negative master mold having been inspected by personnel of the defendant, rejected it as of March 5, 1965 on the ground that the relief model—which had been cast from the negative master mold—was unsatisfactory. Ultimately, the contract was terminated as to the negative master mold (and other undelivered items) for default on April 29, 1966; and it appears that as of such date, the negative master mold still had not been inspected by personnel of the defendant. It was the position of the contracting officer in effecting the termination as to the mold that its defective condition could be assumed because the relief model, which had been cast from the mold, was unsatisfactory.

In the administrative proceedings, the Armed Services Board of Contract Appeals said that the contracting officer was not justified in concluding that the negative master mold was necessarily defective because the relief model, which had been cast from the mold, failed to meet the contract specifications. On the other hand, the Board found, on the basis of the evidence before it, that the negative master mold actually failed to meet the contract specifications; and the Board denied the plaintiff's appeal from the contracting officer's action in terminating the contract as to the negative master mold for default.

■ The Board's finding that the negative master mold failed to meet the contract specifications was supported by substantial evidence in the record before the Board. Therefore, under the first section of the Wunderlich Act (41 U.S.C. § 321), the administrative determination must be accepted by the court as final and conclusive, without an independent weighing of the pertinent evidence, since the question of whether material furnished under the contract complied with the specifications was one of fact. American Marine Upholstery Co. v. United States, 170 Ct.Cl. 564, 573, 345 F.2d 577, 582 (1965).

The "default" provision of the contract stated in part as follows:

(a) The Government may, * * * by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof * *.

Even if it is assumed, for the purpose of discussion, that the actions of the contracting officer in extending the delivery date as to the relief model, which was cast from the negative master mold, were impliedly applicable to the mold itself, the very last date thus fixed for the delivery of a satisfactory negative master mold was August 16, 1965. As of that date—and also as of April 29, 1966, when the contract was terminated as to the negative master mold and other undelivered items—the plaintiff had failed regarding the mold (in the language of the "default" provision of the contract) "to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof." Consequently, a sound basis existed for the termination of the contract as to the negative master mold for default.

■ It is doubtless true—as the Armed Services Board of Contract Appeals indicated—that the defendant's personnel was chargeable with faulty administration of the contract in rejecting the negative master mold without actually inspecting it and on the basis of a conclusion that the mold was necessarily defective because the relief model, which had been cast from the mold, failed to meet the contract specifications. On the other hand, the defendant's poor administrative practice did not excuse the plaintiff from complying with the contract by producing within the prescribed period, as extended, a negative master mold that met the requirements of the contract.

Since the plaintiff was in default as of April 29, 1966 with respect to the production of a negative master mold meeting the requirements of the contract, the contract was subject to termination as to the mold under the "default" provision. Accordingly, the Armed Services Board of Contract Appeals did not err in upholding the terminating action of the contracting officer as to the mold.

### The Breach-of-Contract Issue

The petition alleges that the defendant breached the contract "in that it failed to furnish to plaintiff the superior knowledge it had concerning correction of a bow tolerance deviation."

As indicated in an earlier part of this opinion, the plaintiff has not sought a trial *de novo* respecting the alleged breach of contract. Instead, the plaintiff has indicated a willingness for this issue to be determined by the court on the basis of the evidence in the administrative record.

It has been mentioned previously that one of the major defects which caused the defendant's personnel to reject the relief model (item *d*) was its failure to comply with the requirement of the contract as to bow tolerance.

In connection with the breach-of-contract issue, the plaintiff relies strongly upon this court's decision in the case of Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437

(1963). In that case the court held that in the contracting process, where the Government has in its possession vital information respecting some novel matter affecting the contract, and the Government is aware that the bidders need such information and cannot reasonably be expected to have it, the Government has an affirmative duty to reveal what it knows to bidders, and cannot properly "let them flounder on their own" (312 F.2d at p. 778, 160 Ct.Cl. at p. 444).

All the portions of the administrative record cited by the plaintiff in the part of its brief dealing with the breach-of-contract issue have been carefully examined. The cited portions of the administrative record do not establish an awareness on the part of the defendant during the contracting process that it possessed vital information concerning the production of radar map sets—including the factor of bow tolerance in relation to the relief model—which the bidders in general (or the plaintiff in particular) did not know and could not reasonably be expected to know.[1] Hence, the circumstances did not impose on the defendant an implied obligation to furnish to the bidders information beyond the scope of the contract specifications with respect to the bow tolerance factor in relation to the relief model.

It must be concluded, therefore, that the evidence in the portions of the administrative record cited by the plaintiff does not show that the defendant breached the contract by failing to furnish to the plaintiff "the superior knowledge it had concerning correction of a bow tolerance deviation," as alleged in the petition.

## CONCLUSION

For the reasons previously stated in this opinion, the plaintiff is not entitled to recover. Accordingly, the plaintiff's motion for summary judgment should be, and is, denied; the defendant's cross-motion for summary judgment should be, and is, allowed; and the petition should be, and is, dismissed.

[1]. It should be mentioned in this connection that the plaintiff's brief emphasizes the plaintiff's expertise in the model-making business.