See also 12 Cl.Ct. 496.

**McCORMICK CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 714–85C.**

United States Claims Court.

Sept. 26, 1989.

---

Harry R. Silver, Washington, D.C., for plaintiff.

Carol N. Park–Conroy, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

This government contract dispute is before the Court for post-trial disposition. Plaintiff, McCormick Construction Co., brought this action on behalf of its subcontractor, Western Well & Pump, Inc., for increased costs of performance allegedly incurred by Western while drilling three production water wells. Plaintiff asserted two distinct theories of recovery, a differing site condition claim and a breach of contract claim allegedly due to the withholding of superior knowledge.

## FACTS

On February 14, 1984, The United States Army Corps of Engineers, Fort Worth District, awarded McCormick Construction Company a firm, fixed price contract for the construction of three water wells (hereafter referred to as Frenchy 1, Frenchy 2, and Escondido 1), a water storage tank, and related pipelines and roads that would connect with the existing pipeline supplying water to Holloman Air Force Base, New Mexico. The proposed well sites were located in alluvial fans [1] formed by erosion

---

1. In an alluvial formation, boulders and rock material wash down the side of a mountain

onto the valley floor. This rock material is

and outwashes from the Sacramento Mountains at the mouths of Dog Canyon and Escondido Canyon.

In late 1981, R.L. Guffey, Inc. had drilled exploratory test wells pursuant to a contract with Holloman Air Force Base. Guffey maintained and supplied drillers formation logs and geophysical logs [2] to the Office of the Directorate of Engineering at the Holloman AFB, in compliance with his contract. The Office of the Directorate of Engineering, retained the logs and Quality Assurance Evaluation (QAE) logs, which chronicled the Guffey drilling depths and identified other relevant data, including problem areas.

Once the plans and specifications for the water well constructions were prepared by the Geotechnical Branch Chief of the Fort Worth District of the Army Corps of Engineering, the Invitation For Bids was circulated requesting that all interested bidders arrange site visits. The IFB "urged and expected offerors or quoters to inspect the site and satisfy themselves as to all the local conditions that may affect the cost of performance of the contract." Section 2E of the IFB informed bidders that electric logs and geological information were obtainable at the Directorate of Engineering if the contractors desired to procure such documentation.

Western's president, Mr. Roy Senior, as well as Mr. Dean Mitchell, Western's "tool pusher," [3] prepared Western's bid for the subcontract with McCormick after visiting the construction location for a pre-bid investigation. Subsequent to his site visitation with Mr. John Samuel Miller, a Corps of Engineers' construction representative, Mr. Senior asked where he could obtain supplementary materials on the well sites. Mr. Senior was directed to the civil engineering headquarters but had difficulty in locating the office and finding Mr. Wall, the person Mr. Miller told to him contact there. Once inside what he assumed was the correct building, Mr. Senior asked for the Corps of Engineers office. No one he asked knew where it was. He then entered an unidentified office and spoke with some unidentified person. The most we know is that the office he entered was not that of the Directorate of Engineering and that the person he spoke to was not Mr. Wall. Once inside the office, Mr. Senior requested the electric logs and driller's logs.[4] After obtaining a copy of the logs of R.L. Guffey, Inc.,[5] Mr. Senior departed.

On February 14, 1984, defendant awarded McCormick Construction Company, Inc. the construction contract, including the drilling assignment. McCormick, in turn, subcontracted with Western Well & Pump Inc. to drill the wells, pursuant to the conditions of the contract between McCormick and defendant. Western drilled its wells at three of the four sites at which the Guffey exploratory test wells had been drilled, reaming the test holes to the designated diameter. Mr. Senior testified that he reamed the test holes because he believed that the Guffey logs indicated problem-free drilling. Mr. Senior did not perceive boulders as a problem, believed the predominant material was invariably listed first in formation logs, and boulders were never listed primarily in any of the reported findings. Although the logs did specify one

deposited in a "fan-like" fashion in a process that has been continuing for millions of years.

2. Guffey was required to produce an assortment of logs designated as a "suite of logs," and generically referred to as "electric logs." One particular division of the geophysical log is the induction log, also labeled "electric log," which indicates the rate of penetration. Mr. Guffey obtained and recorded formation segments at ten feet depth levels.

3. A tool pusher has the daily responsibility of acting as drilling supervisor.

4. Mr. Senior asked distinctly for these two logs because he recalled paragraph 4.4 of Section 2E of the IFB, which mentioned the electric logs, and because he knew that a set of driller's logs had been required in accordance with the test well contract specifications he had received as a potential bidder.

5. Guffey testified that these formation logs were comparable to the logs he had prepared for the past 20–25 years, and that when preparing logs, he observed the cuttings, the way the rig was running and the drilling time. According to expert testimony, the material descriptions on the Guffey logs conveyed an alluvial setting, containing boulders, sand and clay.

loss of circulation, Western regarded this as a reassurance of normal conditions and claimed that the mention of this one instance of lost circulation implied no other problems existed. Plaintiff's drilling difficulties were exemplified, however, by twenty-two "twist-offs" [6] as well as losses of circulation [7] experienced while drilling the three wells. Western anticipated it would take twenty-four days to drill the wells; it actually took seven weeks. Plaintiff contended that it relied entirely upon the logs of R.L. Guffey, Inc. in attempting to analyze subsurface conditions for purposes of drilling. It further declared that these logs were imprecise, deceptive and uninformative. Plaintiff attributed its dependence on the Guffey logs to defendant's failure to furnish additional information. Plaintiff argued that the government had actively concealed or had knowledge of information that would have alerted plaintiff to the subsurface conditions. Furthermore, Plaintiff maintained that had it been apprised of the unanticipated heavily bouldered conditions, Western would have adjusted its bid accordingly.

## DISCUSSION

The first issue before the court is whether Western encountered conditions that differed materially from those described in the pertinent documents, *i.e.*, a differing site condition. The Government ordinarily relies on the Differing Site Conditions clause of its contracts to defeat unascertainable risks not atypical of a competitive bidding arrangement, and to procure favorable offers from bidders who need not worry about such caveats. *See, e.g., Stock & Grove, Inc. v. United States*, 493 F.2d 629, 646 (Ct.Cl.1974). Such a contractual policy permits Government to decrease costs, while simultaneously compensating bidders who encounter subsurface conditions not

envisioned when preparing bids and not cognizable from site observation or obtainable data. *Id.* The pertinent section of the differing-site-conditions provision of the contract in dispute (provision four) is as follows:

DIFFERING SITE CONDITIONS

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.

Plaintiff alleged that it is entitled to an equitable adjustment because it encountered a Type 1 differing site condition when drilling the wells. To prevail on such a claim, plaintiff must demonstrate by a preponderance of the evidence that the conditions described or indicated in the contract documents were materially different from those encountered during performance. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984) (citing *Arundel Corp. v. United States*, 207 Ct.Cl. 84, 515 F.2d 1116, 1128 (1975)). The scope of the word "indicated" in a contract document depends on interpretation of the contract, therefore classifying

---

**6.** A twist-off is the severing of the drill bit or drill pipe caused by stress and/or metal fatigue. Western met with one twist-off per every 10,000 feet drilled, which trade standards suggest is extraordinary. When a twist-off occurs, drilling stops until the broken off bit or pipe can be retrieved and the drill repaired.

**7.** A loss of circulation is a massive loss of "lubricating" fluid from the drill hole through the permeable sides of the hole. An example of such a zone would be one that is heavily bouldered with little or no sand, gravel, dirt or silt between the boulders to hold in the drilling fluid. Such losses of circulation are caused exclusively by subsurface conditions.

its definition as a matter of law to be determined at the court's discretion. *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 51 n. 5 (1983), *aff'd*, 754 F.2d 338 (Fed.Cir. 1985); *Mojave Enters. v. United States*, 3 Cl.Ct. 353, 357 (1983). "Contract documents" can be interpreted with considerable breadth to include not only the bidding documents (Invitation for Bids, drawings, specifications and other documents physically furnished to bidders) but documents and materials mentioned in the bidding documents as well. *See, e.g., Hunt & Willett, Inc. v. United States*, 168 Ct.Cl. 256, 268–79, 351 F.2d 980 (1964). Evidence as to a material difference most commonly illustrates that a larger amount of work than initially contemplated or that an alternative method of workmanship must be implemented in order to complete the contractual agreement. To determine whether plaintiff has made such a compensable showing, the court must place itself into the shoes of a "reasonable and prudent" contractor, *H.N. Bailey & Assocs. v. United States*, 196 Ct.Cl. 156, 449 F.2d 387, 390 (1971), and ascertain whether the conditions shown to be actually encountered were reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding. *Pacific Alaska Contractors, Inc. v. United States*, 193 Ct.Cl. 850, 436 F.2d 461, 469 (1971). A contractor will not be awarded an equitable adjustment for a differing site conditions claim unless the contract indicated just what the conditions were that one might expect. *P.J. Maffei Bldg. Wrecking*, 732 F.2d at 916 (citing *S.T.G. Constr. Co. v. United States*, 157 Ct.Cl. 409, 414 (1962)); *Foster Constr. C.A. & Williams Bros. v. United States*, 193 Ct.Cl. 587, 435 F.2d 873, 875 (1970). "[A]ll that is required is that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect 'subsurface or latent physical conditions at the site differing materially from those indicated in this contract.'" *Foster*, 435 F.2d at 875 (quoting the trial commissioner who reviewed the parties' cross-motions for summary judgment). Plaintiff must also prove that it reasonably relied upon its interpretation of the contract and contract-related documents, and that it was damaged as a result of the material variation between the expected versus the encountered conditions. *See Sanders Constr. Co. and Ray Kizer Constr. Co. v. United States*, 220 Ct.Cl. 639, 641, 618 F.2d 121 (1979). Finally, if and when these standards have been established by plaintiff, the contractor must demonstrate that its claimed excess costs were solely attributable to the materially different subsurface conditions within the contract site. *See P.J. Maffei*, 732 F.2d at 916 (citations omitted).

■ The court's inquiry into these matters began at Western's pre-bid site inspection. The IFB had ardently advised, *inter alia*, that prospective bidders investigate the site, and provision forty-five of McCormick's construction contract warned that the government would not assume responsibility for any conclusions or interpretations made by the contractor on the basis of the information made available by the government. *Mojave Enters. v. United States*, 3 Cl.Ct. 353, 357–58 (1983). As will be apparent, Western disregarded the contract admonitions about site investigations, made numerous unreasonable suppositions, and submitted its bid without making further inquiry as to subsurface conditions.

According to both parties' expert witnesses, the information plaintiff obtained from the site investigation should have put plaintiff on notice that it might encounter lost circulation and large, nested boulders. Plaintiff's expert witness, Mr. Truman Bennett, confessed that a contractor could typically expect a loss of circulation in an alluvial fan setting. It is undisputed that Western was aware of the alluvial situation. Furthermore, Mr. Glenn Hammock, a geologist of thirty years experience, testifying for the defense, expressed that upon a pure surface site investigation it was apparent that there would be rocks in the subsurface; in essence, according to Hammock it was "a driller's nightmare." Mr. Hammock could not understand how any knowledgeable drilling contractor would not have come to the same conclusions. Upon the pre-bid site inspection alone,

Western, as a reasonable contractor, should have been put on notice that it was going to encounter extremely difficult drilling conditions inherent in drilling in alluvial fan settings.

Plaintiff attempted to de-emphasize the importance of an on-site analysis by citing *Foster*, for the proposition that a standard pre-bid site investigation clause in a contract is in no way intended to address subsurface conditions. Unfortunately for plaintiff, this case is not governed by *Foster*. Although *Foster* extrapolated that the duty to make an inspection of the site does not negate the changed conditions clause of a contract, it also affirmed that a contractor is not justified in relying on contract manifestations of the subsurface when relatively modest inquiries might have uncovered differing conditions. *Foster*, 435 F.2d at 888. Plaintiff in this case need not have dug far to have uncovered problem boulders, in fact, plaintiff need not have dug at all since boulders were candidly exposed during the pre-award inspection. *Vann v. United States*, 190 Ct.Cl. 546, 420 F.2d 968, 983 (1970); *Mojave Enters.*, 3 Cl.Ct. at 358. More significant, however, is that *Foster* explained that an alluvial condition limits the reliability of the logs to the immediate vicinity of the drill hole. *Foster*, 435 F.2d at 886. In addition, plaintiff in *Foster* was not aware of the alluvial condition whereas plaintiff in the case at bar clearly knew of the alluvial nature of the drilling area. As a competent water well drilling company, it could easily have taken the proper precautions for drilling in an alluvial setting.

Western sought an equitable adjustment here not because it encountered boulders, but rather because it allegedly encountered unanticipated "problem" boulders. Mr. Mitchell was the only witness with genuine knowledge of the conditions actually encountered as he was present at the three well sites. He testified that it was only the large boulders that caused Western problems. However, Mr. Mitchell classified rocks larger than four inches in diameter as boulders, whereas witness testimony indicated that most water well drillers considered rocks larger than eight inches in diameter to be boulders and deem any rock less than eight inches, cobble.

The crux of plaintiff's argument was that it exclusively relied upon the Guffey logs, and that such reliance was justifiable. Plaintiff argued that a reasonable water well driller, after viewing the logs, would assume normal drilling conditions without complications. The court finds plaintiff's dependence solely on the Guffey logs, as well as the various assumptions plaintiff gleaned thereby, to be unreasonable. In support of this finding, the court need only look to the amount of time Western anticipated it would require to drill the wells.

After viewing the Guffey logs, Western presumed that the test wells had been drilled in a day. A reasonable water driller familiar with alluvial fans would never have made such a presumption, as attested to by both defendant's and plaintiff's witnesses. Mr. Bennett certified the senselessness in Western's postulate when he commented that by just looking at the logs one could tell that it would take at the very least four days to drill each test well. "While a contractor need not demonstrate that its interpretation of the contract is the only reasonable one, it does bear the burden of showing that its construction is at least a reasonable reading." *P.J. Maffei Bldg. Wrecking*, 732 F.2d at 917 (citing *Max Drill Inc. v. United States*, 192 Ct.Cl. 608, 427 F.2d 1233, 1245 (1970)) (emphasis omitted). On the basis of all the information available to Western at the time it submitted its bid, the difficult drilling conditions Western encountered were reasonably foreseeable and cannot constitute a differing site condition. *See Stuyvesant Dredging v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987) (a contractor is not misled by the contract where it has the opportunity to learn the facts). The court finds that Western's converse interpretation of the contract is not a reasonable reading.

■ Even if dependence on the logs were reasonable as plaintiff proposed, the evidence presented at trial attested to the fact that the Guffey logs did indeed indicate very arduous drilling conditions. The court notes that the log for Frenchy 1

indicated not only that boulders would be encountered, but that difficult drilling conditions and lost circulation could be expected. The log for Frenchy 1 depicted the area as comprised of gravel, boulders, loose boulders, clay sticks, gravel embedded in clay, conglomerate, lime conglomerate with black rock, caliche, and black rock. With respect to the Frenchy 2 log, the government's expert Mr. Glen Hammock, and Mr. James Cole another bidder, affirmed that drilling conditions were harsh. Listed in the Frenchy 2 log were gravel, boulders, boulders (large), loose gravel, boulders with sandy red clay sticks, reddish clay, conglomerate, cobble stone, tight gravel, and a lime shelf. It also indicated that circulation was lost between 130 and 140 feet. Witnesses attested to similar conditions at Escondido. Recorded under the Escondido log, was gravel, boulders, limestone conglomerate with clay sticks, loose gravel, clay, tight conglomerate, gravel, gravel embedded in clay, lime, conglomerate (lime and black rock) streaks, caliche with boulders, caliche streaks, clay hard pan, and conglomerate (hard). Western, however, claimed the logs indicated normal drilling conditions and small boulders, based upon its conviction that driller's logs should list the formation materials in the order of predominance. That conviction was later refuted by Western's own expert, Mr. Truman Bennett. Mr. Bennett admitted that the "fact that gravel is listed as the first material encountered says nothing about the relative percentage of the gravel and boulders that are encountered at those elevations." Further, Mr. Guffey testified that it was impossible to identify the predominant materials on a log, as well as the difference between cobble and boulders since the materials are granulated during drilling. Mr. Senior conceded during cross-examination that determining the percentage rates of the materials shown present in the logs, requires great speculation.

■ Assuming, *arguendo*, that plaintiff were correct in its interpretation of the Guffey logs, precedent states that a contractor will be held responsible for "patent indications plainly, to a layman, contradicting the contract documents." *Stock & Grove, Inc. v. United States*, 204 Ct.Cl. 103, 493 F.2d 629, 631 (1974). Since Western should have been on notice due to the site investigations and Guffey's affirmation of the heavily-bouldered, difficult drilling conditions, it was far from astute in relying on its erroneous interpretation of the logs. This is not the proficiency one would expect from the reasonable and prudent subcontractor.

> It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove ... that he was misled by the contract.

*Vann v. United States*, 190 Ct.Cl. 546, 420 F.2d 968, 982 (1970). *See Stuyvesant Dredging*, 834 F.2d at 1582. Based upon the foregoing, it is apparent that the "reasonably competent water driller" standard was not met by Western and that its interpretation of the Guffey logs was not reasonable. The court thus finds plaintiff's claims under the differing site condition clause of the contract to be invalid.

■ The court now turns to the issue of defendant's alleged suppression of superior knowledge. Superior knowledge is "knowledge which is vital to performance of the contract but which is unknown and is not reasonably available to bidders who are thereby misled." *Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 52 (1985). In order to prevail upon its superior knowledge claim, plaintiff must demonstrate that defendant had vital information of some matter affecting contract performance, that defendant was aware Western needed this information which Western claimed was not obtainable, and that defendant had an affirmative duty to reveal its knowledge to Western. *Panoramic Studios, Inc. v. United States*, 188 Ct.Cl. 1092, 413 F.2d 1156, 1166–67 (1969); *Helene Curtis Indus. v. United States*, 160 Ct.Cl. 437, 312 F.2d 774, 778 (1963).

■ Plaintiff alleged that none of the bidders, Western included, were ever in-

formed of the difficult test drilling conditions, and that defendant failed to provide copies of the electric logs to Western prior to submitting its bid. Plaintiff claimed that such information was vital and therefore defendant's failure to disclose this knowledge rendered it liable for breach of contract. Furthermore, plaintiff maintained that if the government chose to supply test boring data to solicitors, it had an absolute, unqualified obligation to do so. Plaintiff, however, neglected to recognize that "a bare withholding is not enough to make out a case." *Leal v. United States,* 149 Ct.Cl. 451, 276 F.2d 378, 383 (1960). Plaintiff does not have an action for breach of contract unless it can prove that the alleged withholding of information in this case, in fact, misled plaintiff. *Ragonese v. United States,* 128 Ct.Cl. 156, 120 F.Supp. 768, 770–71 (1954). If plaintiff knew or should have known that it would encounter such a heavily-bouldered condition, it cannot be said plaintiff was misled. *Id.* at 771. *See Leal,* 276 F.2d at 383.

Plaintiff's position was that defendant's alleged withholding of the electric logs, which plaintiff contended was vital information, constituted a suppression of superior knowledge. Although Western received the Guffey logs, it complained that this was insufficient information for preparation of a bid, even though the logs provided the sole basis for its bid. Plaintiff suggested that additional relevant and vital data was not provided to Western as mandated by the contract and therefore a breach had occurred.

Contrary to plaintiff's understanding, the evidence indicates and the court so finds that neither the Guffey drilling rate recorder nor the geophysical logs contained "vital" information. Such reports would provide them with nothing more than the knowledge that they already had or knowledge only discernible by a geophysical expert. Although, Mr. Senior alleged that he would have retained an expert to read the geophysical logs, he did not demonstrate

why such information was vital, nor did he disclose exactly what geologic information was contained in these logs that would have been of assistance to plaintiff.

■ An important factor in the suppression of superior knowledge is the unavailability of information. *J.F. Shea,* 4 Cl.Ct. at 53 (citation omitted). As previously discussed, the Guffey driller logs, together with a site visit, should have cautioned a reasonably prudent driller that drilling conditions would be less than ideal. According to witness testimony of one of Western's associates, as well as two other bidders, Guffey had informed them of the exacting drilling situation. All the court has before it is Mr. Senior's testimony that he went to an unidentified office, asked for information from an unidentified person, and received the Guffey logs. That testimony, by itself, does not provide sufficient grounds for a superior knowledge claim. "[W]here a contractor 'has opportunity to learn the facts, he is unable to prove ... that he was misled by the contract.'" *Stuyvesant Dredging,* 834 F.2d at 1582 (quoting *Vann,* 420 F.2d at 982); *See Morrison–Knudsen Co. v. United States,* 170 Ct.Cl. 712, 345 F.2d 535, 539–40 (1965); *Flippin Materials Co. v. United States,* 160 Ct.Cl. 357, 312 F.2d 408, 413–15 (1963). The contract directed Mr. Senior where to find the well drilling information. Mr. Miller directed Mr. Senior where to go and whom to contact. The information was available, but Mr. Senior never went to the right place. The government cannot be held liable for Mr. Senior's failure to find the Directorate of Engineering where the information was being held. Mr. Senior did not seek out Mr. Wall nor did he recollect the person who responded to his inquiry for the information.[8] Neither plaintiff nor Mr. Senior could say with any sense of certainty where Mr. Senior eventually obtained the alleged insufficient information or whether Mr. Senior had visited the correct office. After considering all the pertinent evidence

---

**8.** Mr. Senior's inability to identify the person to whom he directed his queries is extremely significant since it prevents defendant from disputing any of his declarations about this "person."

Therefore, the court feels it must depreciate the value of Mr. Senior's testimony about the individual who imparted the logs to him. *See Boraiko v. United States,* 146 Ct.Cl. 814, 817 (1959).

in the record, it is apparent that plaintiff could not reasonably have been misled by the government's initial failure to supply plaintiff with those documents which it, after the fact, desired. "[A]ny misleading that occurred was due to plaintiff's own unreasonable assumptions." *Mojave Enters.*, 3 Cl.Ct. at 358; *see generally Hunt & Willett, Inc. v. United States*, 168 Ct.Cl. 256, 351 F.2d 980, 985–86 (1964); *S.T.G. Constr. Co. v. United States*, 157 Ct.Cl. 409 (1962).

Because of the court's holding, the other assertions by both plaintiff and defendant need not be resolved. Plaintiff's retorts to defendant's statements alluding to inefficient equipment and inexperienced personnel need not be examined, nor is it necessary for this court to determine whether plaintiff bore too deep, beyond contract indications. The previously addressed rejoinders negate a positive response to the differing site conditions issue and render further inquiry as to that question of fact unnecessary.

## CONCLUSION

Following extensive review of the facts and witness credibility, the court must conclude that plaintiff is not entitled to relief based upon its differing conditions claim nor on its alternative claim of government repression of superior knowledge. The plaintiff has not proven either allegation of contract breach by a preponderance of the evidence and, therefore, defendant cannot be found liable. Any unanticipated work and costs that confronted Western must be regarded as the result of Western's delinquency in not taking proper precautions or as the result of its erroneous conclusions. Plaintiff's complaint is dismissed. The Clerk of the court is instructed to enter judgment accordingly.

IT IS SO ORDERED.