John G. VANN and Birmingham Fire Insurance Company of Pennsylvania

v.

The UNITED STATES.

No. 171–64.

United States Court of Claims.
Jan. 23, 1970.

I. H. Wachtel, Washington, D. C., attorney of record, for plaintiffs.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFFS' ASSIGNMENT OF ERRORS AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to prepare and file his opinion on the issues raised by plaintiffs' assignment of errors * and defendant's motion for summary judgment. The commissioner has done so in an opinion and report filed on May 27, 1969, wherein such facts as are necessary to the opinion

are set forth. Defendant filed a request for review by the court of the commissioner's opinion, report and recommended conclusion to which plaintiffs responded stating that no exception was taken to the extent that the commissioner had denied plaintiffs' claim and urging acceptance of his conclusion on the "Eastern Light Claim" and "Northwest Light Changed Condition Claim". The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, report and recommended conclusion, with minor modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore:

1. The plaintiffs' motion is allowed in part, defendant's cross-motion correspondingly denied, and partial summary judgment entered

(a) adjudicating that the contract was breached by defendant's termination for an alleged default by plaintiff Vann in performance at Eastern Light, and that the defendant is liable for damages, to be determined in proceedings in this court; and

(b) awarding damages to plaintiff Vann in the sum of $3,315, the net amount assessed against him as liquidated damages, the further damages, if any, to be determined in proceedings under Rule 47(c) [since September 1, 1969, Rule 131(c)], to begin after a period of 90 days.

2. The plaintiffs' motion for summary judgment is further allowed in part, defendant's cross-motion correspondingly denied, and partial summary judgment entered, awarding damages to plaintiff Vann in the sum of $2,289.42, on the Northwest Light changed conditions claim.

3. The defendant's motion to amend its answer to plead an affirmative de-

---

* The assignment of errors procedure under which the case was submitted by plaintiffs has been superseded by Rules 94–100 [since September 1, 1969, Rules 161–167].

The commissioner's opinion and report was submitted pursuant to Rule 99(c) [since September 1, 1969, Rule 166(c)].

fense of release and additional counterclaims is granted. The plaintiff's motion is further allowed in part, defendant's cross-motion correspondingly denied, and partial summary judgment entered striking the defense of release and dismissing all the counterclaims.

4. The plaintiffs are not otherwise entitled to recover. The defendant's cross-motion for summary judgment is allowed in all other respects, plaintiffs' cross-motion correspondingly denied, and partial summary judgment entered dismissing all claims in the petition except as specified in the foregoing.

Commissioner Schwartz' opinion, with minor modifications by the court, is as follows:

Plaintiff Vann made a contract in 1961 with the Coast Guard, to repair and rebuild two harbor lights in Key West Harbor, known as Eastern Triangle Light and Northwest Light, for $19,850. He completed the work at Northwest Light, and the contract was terminated by the Government for an alleged default in performance at Eastern Light. The plaintiff contested the default-termination and made claims, under the disputes clause in the contract, with respect to both lights, some of which were upheld and some denied by the Coast Guard Board of Contract Appeals. The Board's decision was thereafter approved by an Assistant Secretary on behalf of the Secretary of the Treasury.

The contractor has now brought suit in this court to review the decisions against his claims. His surety, also a party plaintiff, makes no claim other or greater than does the contractor, and the plaintiffs will be referred to as if the contractor were the sole plaintiff. The Government makes various defenses, among them a release, and has pleaded

counterclaims for the sums awarded by the Board.

The present proceeding was begun by the assignment by the plaintiff of errors allegedly committed by the Board. Defendant responded with a cross-motion for summary judgment, the court in the interim having by new rules replaced assignment of errors with provision for the review of board decisions by motion for summary judgment. The case thereby presented is in substance one of cross-motions for summary judgment on various claims and counterclaims, on the record before the Board, on the ground of erroneous decisions by the Board, not entitled to finality under the Wunderlich Act, 41 U.S.C. §§ 321, 322. Both parties contend that the Board made findings of fact unsupported by substantial evidence, omitted to make findings required by the substantial evidence, and made erroneous conclusions of law.

On the merits both motions are granted in part and denied in part. The release is held to be ineffective. The default-termination is held to be a breach of contract by the Government. All the counterclaims are dismissed.

### The Defense of the Release

The release, not part of the administrative record, was uncovered by defense counsel in an additional investigation made after the answer had been filed. The Government, in its cross-motion for summary judgment, requests, and plaintiff consents, that the answer be deemed amended to plead the release.

The text of the release contains in conventional language a release and discharge of the Government "of and from all liabilities, obligations, claims and demands whatsoever under or arising from" the contract in question, in consideration of $2,289.48,[1] then paid, with,

---

1. This sum comprised two sums, $1,524.48 and $765. The $1,524.48 was the net amount due on the Board's award of $1,-194.48, on account of a Northwest Light changed conditions claim, and $555 on account of a Northwest Light priming claim. From the total of $1,749.48, the

Board deducted $225 to correct an error made by the contracting officer in computing the liquidated damages assessed on account of plaintiff's default at Eastern Light. The remainder, $1,524.48, was paid on the execution of the release.

The sum of $765 was paid with the

however, an exception reading as follows:

Except claim asserted against the United States Government by JOHN G. VANN in the United States Court of Claims, No. 171–64 in the amount of $56,050.00.

A final proviso reads as follows:

Provided, however, that this instrument will not be binding if the foregoing decision, as rendered by the Assistant Secretary of the Treasury, is subsequently found to be in violation of the standards set forth in the Wunderlich Act (41 U.S.C. 321).

Both the exception and the proviso make the release ineffective to bar the claim made by plaintiff.

*The Exception.* The release was executed by the plaintiff in August of 1964, through his then counsel, after counsel had earlier, in June of that year, filed the suit in this court. Two years later, in August 1966, his successor, present counsel, filed an amended petition, with leave of court. While both original and amended petitions prayed for $56,050 in damages, the amended petition extensively rewrote and enlarged the allegations.

The government contends that the "claim asserted" in this case, to which the exception applies, is the claim as it stood on the date of the release, in the unamended petition; that Rule 17(a) * (Rule 14(b) * could also be cited) requires that a petition allege specifically the administrative action sought to be reviewed in this court, in the same manner as does Rule 95(a),** thereafter adopted specifically for review of board

decisions subject to the Wunderlich Act; that four separately stated claims in the amended petition, not having been alleged in the original petition, are under the rules not a part of the "claim asserted" in the original petition, and thus not within the exception to the release.

■ Without the exception (putting aside the proviso), the breadth of the release would bar the suit. It is immaterial that the release was given (see n. 1, *supra*) in exchange for amounts already due to the plaintiff. United States v. William Cramp & Sons Co., 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983 (1907); J. G. Watts Construction Co. v. United States, 161 Ct.Cl. 801, 806 (1963). A claim not specifically delineated in an exception to a release is thereafter barred. H. L. C. & Associates Const. Co. v. United States, 176 Ct.Cl. 285, 290–295, 367 F.2d 586, 588–593 (1966); Utah Const. & Mining Co. v. United States, 168 Ct.Cl. 522, 535, 339 F.2d 606, 614 (1964), rev'd on other grounds, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

■ The question presented is whether the exception in the release for the "claim asserted" in this case sufficiently delineates the matters thereafter pleaded in the amended petition. The answer depends, of course, on a comparison of the contents of the original and amended petitions.

In the original petition, in the paragraphs prior to paragraph 14, plaintiff recounted various actions of the contracting officer on matters arising during the performance of the contract.

---

release to rectify an oversight by the Board. In stating the sums payable to plaintiff, the Board had overlooked the remission of liquidated damages in that amount, collected by the government, at the rate of $15 per day, for each of the 51 days of delay found by the Board to be chargeable to the government in connection with the changed condition at Northwest Light.

At the time of the release, plaintiff had already claimed the $765, in his petition in this court. The claim for this sum has

been withdrawn by a stipulation in the record. The government's counterclaims are *pro tanto* increased, and now include the $1,194.48 and the $765 awarded on account of the Northwest Light changed condition claim, and the $555 awarded on account of the Northwest Light priming claim, a total of $2,514.48.

\* Since September 1, 1969, Rules 35(a) and 33(b).

\*\* Since September 1, 1969, Rule 162(a).

Changed conditions at both lights are mentioned. In paragraph 14, plaintiff alleged that he appealed from the decisions of the contracting officer to the Board, and that the Board and the Assistant Secretary "denied all of Plaintiff's claims," with certain stated exceptions in which amounts were awarded with respect to changed conditions at Northwest Light and its priming. Paragraph 15 then broadly alleges that "The foregoing decisions of the Contracting Officer and the Assistant Secretary of the Treasury were unsupported and contrary to all the competent evidence before the Contracting Officer and the Coast Guard Board of Contract Appeals, and were so arbitrary and capricious as to imply bad faith." The "foregoing decisions" and the nature of the errors not being otherwise specified, the petition assorted a generalized claim that every decision of the Board was erroneous.

Defendant answered, making no complaint of a lack of specificity under Rules 14(b),* 17(a) * or otherwise.

The motion for leave to file the amended complaint referred to the changes in the procedures for the review of board cases, brought about by the decisions of the Supreme Court, in June of 1966, in the Grace and Utah cases (United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed. 2d 662 (1966); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)). Leave was prayed to file an amended petition "to more precisely and specifically delineate the factual, legal (and, albeit,) procedural issues."

As promised in the motion, the amended petition specified which of the Board decisions were erroneous, and in what respects, and what relief was demanded. The purpose was clearly as stated in the motion—to specify the decisions attacked, and the issues. Indeed, the allegations as amended are akin to those required of a petition by Rules 94–

100,** thereafter adopted to govern the review of board decisions. The "claim asserted" in the original petition was unchanged.

Even by the government's standards, which limit the amended petition to matters explicitly mentioned in the original petition, the amendments contain little that was not in the original petition. The government concedes that claims for changed conditions at both lights were alleged in the original petition. It would bar, as not "asserted" in the original petition, four of the claims specified in the amended petition.

The first of the four, "The Wrongful Termination Claim," contests the default-termination on plaintiff's failure, by reason of the alleged changed condition, to complete Eastern Light. The claim for wrongful termination, in the circumstances of this case, is substantially synonymous with the changed conditions claim, for the default-termination followed upon the rejection of the claim that changed conditions made it impossible for plaintiff to complete the work. "The Wrongful Termination Claim" added at most an allegation of damages.

The second claim, "The Liquidated Damages Claim," is one for remission of two amounts of liquidated damages—one assessed on the failure to complete Eastern Light, allegedly the result of the changed condition, and the other alleged to have been insufficiently remitted by the Board, upon its ruling that a changed condition was encountered at Northwest Light. This claim, too, is no more than a particularization of damages flowing from the changed conditions which the government concedes were alleged in the first petition.

The third, "The Northwest Light Priming and Sandblasting Claim," is an attack on the sufficiency of the Board's award of $555 for the work of priming. Paragraph 14 of the original petition explicitly mentioned the award of $555;

---

* Since September 1, 1969, Rules 33(b) and 35(a).

** Since September 1, 1969, Rules 161–167.

the amended petition adds only that the Board should have awarded $4,500. Lastly, there is "The Northwest Light Disassembly Claim." That claim is dismissed below, in this opinion, for the failure to present it to the Board. The effect of the release upon it need not be further discussed.

The entire amended petition thus asserts no claim not earlier asserted in the original petition. The exception in the release is squarely applicable.

■ Consideration of Rule 22(c)* of this court confirms the conclusion. A clause in a legal document referring to a claim asserted in a proceeding in a named court must be taken to mean a claim asserted in whatever manner is deemed sufficient under the rules of that court. Rule 22(c) * provides that an "amendment relates back to the date of the original pleading" when the claim asserted therein "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."

■ The test for determining whether the new matter in an amended petition arose from the "conduct, transaction, or occurrence" first pleaded is whether the general fact situation or the aggregate of the operative facts underlying the claim for relief in the first petition gave notice to the government of the new matter. United States v. Northern Paiute Nation, 183 Ct.Cl. 321, 328, 393 F.2d 786, 790 (1968); Snoqualmie Tribe of Indians ex rel. Skykomish Tribe of Indians v. United States, 178 Ct.Cl. 570, 585–589, 372 F.2d 951, 959–961 (1967). See 3 Moore's Federal Practice ¶ 15.15[3] (2d ed.).

■ This test is met by the original petition in this case. The aggregate of operative facts stated was the contract, the disputes arising before the contracting officers, the claims appealed to the Board and its decisions on all the claims. The original petition gave good notice that the plaintiff complained of all these

matters together and wanted damages of $56,050. The amended petition, significantly, did not ask for more money; it set out the individual decisions of the Board complained of and the types of damages demanded. At most, only the allegations of damages were new. Amendments adding additional claims for damages are uniformly held to relate back, under Federal Rule of Civil Procedure 15(c), identical in this respect with this court's Rule 22(c).* Seifert v. Solem, 387 F.2d 925 (7th Cir. 1967) (added claim for exemplary damages in fraud case); Wm. T. Burton, Inc. v. Reed Roller Bit Co., 214 F.Supp. 84 (W.D.La., 1963) (amended complaint increasing $150,000 damages caused by defective equipment by $6 million in consequential damages); United States v. Templeton, 199 F.Supp. 179 (E.D.Tenn.,1961) (claim for double damages added to complaint under False Claims Act seeking forfeitures only).

Whether as present in the original petition or as added and relating back, the claims of the amended petition are the very "claim asserted" in this case which is excepted from the operation of the release.

*The Proviso.* The proviso to the release states that the instrument "will not be binding" if the decision of the Board "is subsequently found to be in violation of the standards set forth in the Wunderlich Act (41 U.S.C. 321)."

The proviso is written in the language of the law of administrative and judicial remedies of government contractors. In that language, a contract suit on a matter which has been the subject of an agency or board decision under a disputes clause may equally be described as a suit upon a contract, in which the government pleads the finality, under the disputes clause and the Wunderlich Act, of the board decision, or as a suit to review and reverse an administrative decision as falling short of, or violating, the standards prescribed in the Act for the finality and nonreviewability of the adminis-

* Since September 1, 1969, Rule 39(c).

trative findings. The present case is thus one in which, in the words of the proviso, it may be found that a board decision is "in violation of the standards set forth in the Wunderlich Act." .

If a release is not to be binding "if" the board decision is "subsequently" found to violate the standards, then it follows that the release may not be used to frustrate the suit in which the finding may be made. If, in the suit, the finding of noncompliance with the standards is not made, the release will by its terms continue to be or again be binding. If the finding of noncompliance is made, then the release "will not be binding." Accordingly, the proviso by its terms prevents the interposition of the release of which it is part to bar the plaintiff's suit.

It is immaterial that such a proviso may reduce the release of which it was a part to the level of a receipt. That the construction here given to the proviso was its deliberate intent appears from the origins of the proviso, an unpublished opinion of the Comptroller General, No. B–125096 of April 30, 1963, in part reported ·in 5 Government Contractor ¶ 231 (1963). .

The opinion is addressed "To the Heads of Departments, Agencies, and Others Concerned", and it opens with a direction that such a proviso as is contained in the instant release be incorporated in all releases executed following board decisions:

> Effective immediately, any release or other contractual instruments entered into as a result of a decision by a board of contract appeals, the head of an agency, or a contracting officer under a contract disputes clause shall include a provision to the effect that the instrument is not binding if the decision is later found to be in violation of the standards set forth in the Wunderlich Act (41 U.S.C. 321).

In the statement of his reasons, which followed, the Comptroller General referred to a standard practice of the execution of final releases, upon the conclusion of government contracts. The effect of such a release, following an agency decision under a disputes clause, he wrote, "is to foreclose further administrative or judicial review unless fraud or gross mistake can be established"; the release consequently "defeats relief under the Wunderlich Act" from agency decisions not supported by substantial evidence, in circumvention of the intent of Congress that such relief be available. The provision which he was directing be included in releases, he concluded, would afford the relief provided by the Act, where appropriate, by "reserving the right of further administrative and judicial review if the decisions are later found not to meet these standards [of the Wunderlich Act]."

### The Claims Concerning Eastern Light

This is a claim that a changed subsurface condition was encountered at Eastern Light, thereby making the completion of the work impossible without a change order and extensions of time which the government refused. The outcome of the claim determines whether the government committed a breach of contract in terminating the contract for default and in assessing liquidated damages of $4,080.

Eastern Triangle Light was a tower and light on a pipe pile foundation, resting on a submerged knoll in Key West Harbor. As a result of a collision, it was loose from its foundations. The contract called for its repair, by inserting its legs into 16-foot lengths of pipe piling first driven into the knoll to a penetration of 10 feet. Grout would then be forced into the space between the leg and the pile.

Plaintiff's case is this: that the contract drawings represented the ocean bottom to be composed of rock, and the area of the Keys is generally known to have a coral bottom (coral and rock are used throughout as synonyms); that his reasonable pre-bid underwater inspections confirmed that the bottom was a normal coral knoll or head, as shown in the drawing; and that the bottom, indeed,

the entire knoll, was in fact a "spoils bottom," composed of "a pile of boulders."

Continuing with plaintiff's contentions: In the course of the work, on the assumption that the bottom was rock, he recommended, and the Coast Guard approved, the drilling of holes into which the pilings would be placed, as preferable to the contract method of driving them into the bottom. The knoll was small and the holes were necessarily drilled near its sides. The drilling caused the knoll to cave in, revealing the spoils. Because of the spoils, he was unable to complete the contract work. Further drilling would have caused more cave-ins, and the pilings could not go through the depth of the spoils and still sufficiently penetrate the true, rock bottom. The government, he concludes, was without justification in continuing to maintain that the bottom was rock, in rejecting his demand for a change order to reengineer the project or to relocate the light, and in terminating the contract for default on his failure to complete the work.

The government maintains that the contract drawings do not represent the bottom to be rock, that the bottom was in fact rock and not spoils, and that the contractor was at fault in drilling instead of driving.

*The Board's Decision.* The Board held that while a changed condition was encountered, the plaintiff, having made a pre-bid underwater inspection, could not possibly have been misled. Further, that drilling, a questionable method of construction, for whose choice the plaintiff was responsible, was the effective cause of the failure to complete the work; that had the plaintiff driven the piles, as the contract provided, the bottom conditions would not have affected performance.

The Board erred, except in its decision that the contract showed a rock bottom when in fact it was spoils. Plaintiff's pre-bid underwater inspections were reasonable, gave no notice of the spoils, and he continued to be misled by the contract drawing. As for drilling or driving, neither could have accomplished performance of the contract provisions for ten-foot penetration into rock. The decision to drill was in any event a joint one. The effective cause of the inability to complete the work was the spoils bottom.

The Board's decision appears from a number of "findings" and "determinations," the latter combining findings of fact and conclusions of law. It is necessary to set them out in some detail, in order to examine the extent of their support in the evidence:

II. a. *Findings of fact concerning Eastern Light*

1. That the Contractor was put on notice by Form CG–2557C to "inspect the site of the proposed work in order to satisfy * * * [the bidder] * * as to all local conditions affecting the contract and as to all the detailed requirements of construction".

2. That the Contractor did perform an underwater inspection of the site before submitting a bid. (R–21)

 * * * * * *

4. That * * * the general depth of water in the area [of Eastern Light] is about 35 feet.

5. That [the site of] Eastern Light * * * [was] a submerged "knoll" in 18 feet of water. * * *

 * * * * * *

10. That the specifications for the new foundation for Eastern Light called for *driving* 16′ lengths of 16″ outside-diameter (½″ wall thickness) pipe piling to a 10′ penetration, after which the concrete-filled legs of the old structure would be inserted in them and secured by filling the remaining internal space with concrete grout.

11. That the Contractor chose instead to *drill* to the required penetration a 24″ socket into which the 16″ pipe piling would be placed and secured by external grouting after the old structure was in place. The Contractor considered that the "play" of the 16″ pipe pilings in the oversize sockets would reduce the problem of fitting the legs of the old structure inside the new

foundation. The Government Inspector approved this alternative method of placing the new foundation members (R–29 30), even though drilling was not the usual method. (R–31)

12. That the drilling operations of the Contractor convinced his superintendent that the site was a "pile of boulders" making up a spoil bank resulting from the original dredging of the channel. (R–32)

13. That divers retained by the Contractor in 1961 described the site of Eastern Light as a knoll consisting chiefly of boulders approximately ten feet in diameter, noting also that some 21′ pipe lengths were on the bottom and 4 to 6 feet of other pipe of undetermined length extended from the bottom of the knoll. (Litsinberger-Glanz affidavit)

14. That the dimensions between the old structure legs required the drilled sockets for the new foundation piling to be located so close to the sloping sides of the knoll that a portion of the bottom material "caved in" while the drilling was in progress.

15. That the knoll itself was 50 to 70 feet long, approximately 18 feet across at its widest point, and of irregular contour. (R–33)

16. That the spacing between adjacent legs of the old structure was 13 feet, and the spacing across the diagonal was a little over 17 feet. (R–33)

17. That Drawing 2774 (dated 19 October 1959) shows Eastern Light as a tower and light on a foundation consisting of a pipe template secured to the bottom with H-beam pins driven to a penetration of 15 feet. The drawing shows an interrupted stylized horizontal line labeled "bottom" and another stylized horizontal line plus-or-minus one foot below it labeled "rock-line." The "bottom" line is 18 feet below mean low water. The H-beam pins are continuous from the platform at the base of the tower through the pipe legs of the template and into the bottom rock.

\* \* \* \* \* \*

19. That, had the new foundation piling been placed by driving instead of by drilling sockets, there would have been no "caving in" of the bottom material on the sides of the knoll. (R–32)

20. That the Contractor professed inability to achieve an average penetration of ten feet with the new foundation piling into the bottom material because of concern that the "knoll would cave in" and that the piling would have "no more than one foot of penetration in the natural channel bottom." (R–38)

21. That the Contractor, by letter of 5 November 1961, alleged that changed conditions had been encountered, namely: (a) a type of bottom differing materially from that indicated on Drawing 2774 which showed a level bottom of about one foot of overburden resting on solid rock; and (b) a bottom consisting of a spoils area of rock boulders and foreign bodies unusual for the Florida Keys.

22. That the Contractor, by letter of 5 November 1961, also requested either relocation of Eastern Light or engineering modification to the contract by way of longer foundation piling. The letter further requested that the contract be suspended as to Eastern Light until the Government furnished "specific instructions as to how to proceed with the performance of this contract" and requested "the necessary extension of time of the contract" due to problems met.

23. That the Contracting Officer, on 14 November 1961, denied the existence of any changed conditions and directed the contractor to "adhere to the method \* \* \* as specified in the contract."

\* \* \* \* \* \*

b. *Determinations*

1. That the bottom conditions at Eastern Light were not identical with those shown on Drawing 2774.

2. That the Contractor knew from physical inspection what the bottom conditions at Eastern Light were in fact and therefore could not possibly have been misled by Drawing 2774.

3. That the decision to drill sockets for the foundation piling instead of driving the foundation piling was the Contractor's.

4. That the bottom conditions encountered would not materially have affected the performance of the contract had the Contractor driven the piling as called for in the specifications.

5. That the failure of the Contractor to complete Eastern Light was due to choice of a questionable method of construction and not to changed bottom conditions.

*The Evidence.* Plaintiff and the government each called only one witness.

The Government's Witness. The government's witness had no personal knowledge of the site or the contract work. He testified as an expert and purported "to present the management engineer's view from a distant point."

His testimony was intrinsically non-persuasive. He took the position that the nature of the ocean bottom—spoils or rock—was irrelevant. He had not even thought about whether the bottom here was spoils, and he evaded giving his opinion on the evidence he had heard. In any case, he maintained, drilling was unacceptable, because it is not good engineering practice to drill in the type of hard coral composing the bottom in the Florida Keys, but his explanation did not explain. He said he had never seen drilling done in the Key West area, yet it was approved by the Coast Guard, and the evidence, as will appear, is that drilling is common and that had the bottom been coral, drilling would have been at least acceptable.

The only important thing for him was penetration to ten feet, which he emphasized had not been achieved by the plaintiff, yet he admitted that the piles should come down through any

hypothetical spoils and penetrate the underlying rock, an obvious impossibility with 16-foot piles in a knoll of the size of this one, if it were composed of spoils.

As we understand its decision, the Board did not rely on any disputed testimony of this witness. Though it cited to the record throughout its detailed findings on Eastern Light, it did not once cite or rely upon his lengthy testimony, despite its relevance to the issue of drilling, an issue to which the Board attached great importance. The rejection of his testimony is sustainable, for it was marked by many of the qualities which deprive the testimony of an expert of credibility. See Sternberger, Trustee v. United States, 185 Ct.Cl. 528, 535–536, 401 F.2d 1012, 1016–1017 (1968).

The Plaintiff's Witness. All of the references to testimony in the Board's findings are to the testimony of plaintiff's single witness, Major E. Threlkeld, the superintendent on the job and for all practical purposes the contractor.

Threlkeld, questioned closely by the several Coast Guard officers on the Board as to his experience, testified that he had been a builder and licensed contractor in Florida for twelve years. He had built houses and other structures. "I have built my own seawalls and designed them. I have built my own docks and designed them." He had worked extensively on marine contracts, for the government and others, as follows:

He had for sixteen months operated three vessels off Cape Canaveral and in the Bahamas engaged in the search and salvage of missiles. In this work he "made up the bids," "designed the boats around the jobs," "rigged the boats," and "ran the boats and did the diving." He also did the business end of the contracting work: "I do all the work and also handle the business." He had, as a contractor for Naval Ordnance, operated a 300-ton salvage vessel for a year at Port Everglades, doing "all types of underwater work" pursuant to Navy orders: "we constructed things under

water for sound tests," "dismantled mines," laid and spliced cable, "set up receiver stations," and "worked with submarines."

He had, for the Navy, "rebuilt the bombing range of the Marquesa's, work which involved pile-driving, setting up targets, building towers." In this work he acted as contractor, and did not "design the job or do the engineering." Asked about the planning of his work as contractor, he said, "I have always had to plan my own work."

He had also worked for a year for the Air Force at Palm Beach, for a year for the Corps of Engineers in Puerto Rico, and he had worked with a contractor in Cuba, doing marine work involving pipe lines.

Following his account of his experience, the chairman stated, "The witness is accepted. His testimony will be regarded as an expert in the field of marine construction." In his further testimony, it developed that he had considerable experience in both drilling and driving into the ocean bottom, in the area of the Florida Keys. The Board, in its "findings of fact of general applicability," found "That the Contractor's superintendent was experienced both in Government contract construction and in marine construction work off the Florida Coast (R–17 to R–20)".

The Evidence. The contract specifications contained a drawing which, the Board found, showed a "rockline" a foot below the "bottom." Finding 17, *supra*. The contract also contained the customary clause enjoining the bidder to make an inspection of the site in order to satisfy himself as to "all local conditions affecting the contract." Finding 1, *supra*. Plaintiff submitted two bids (all the bids first received were rejected). Threlkeld made an underwater inspection of the site at the time of each bid.

He testified that in both instances he went down to look at the site and the type of construction to see "if there was any irregularity as far as the specifica-

tions and the blueprints and in both cases they seemed to be just as described." Asked particularly about the knoll on which Eastern Light rested, he said, "This knoll appeared as a normal coral head." He saw a considerable amount of debris on the bottom, full lengths of pipe, old batteries and ladders. The amount was "rather strange" but not "too strange," and indicated that "someone had been a little wasteful with materials. Those things are usually expected around a Coast Guard site."

His belief, from the drawings and his inspections, that the knoll was a natural coral or rock head, was consistent with the general knowledge of the ocean bottom in the area. As he put it, the Florida Keys are "just one big coral shelf."

In preparing for the work, Threlkeld concluded that it would be better to drill holes for the pilings than to drive them, as the specifications provided.

The legs of the light, pipe with an outside diameter of 13 inches, were under the contract to be inserted into piles whose inside diameter was 15 inches. Threlkeld considered that the two inches between the legs and the piles gave too little tolerance, or play, for dropping the legs into piles which, if driven, would be rigid. Sufficient play would be provided, he believed, if he drilled 24-inch holes for the 16-inch pilings so that he could "rock the pipes" in the oversize holes to align them for the insertion of the legs. Though drilling was "considerably more expensive," Threlkeld felt that because of the tolerance factor it "was absolutely the best procedure."

He presented the proposal to the government inspector stationed at the job, discussed it "thoroughly" with him and had "several conferences" with him. At first the inspector scoffed, in the belief that drilling would be too costly. In his daily reports he wrote that the contractor's idea of drilling to put the piles into the rock would be shown to be "just talk" when he got a price for the work. The inspector was convinced only when Threlkeld brought out a Mr. Evans, the

owner of a firm called Hardrock Drillers, Inc., who guaranteed that he had drilled up to 24 inches in rock and that the holes he would drill would be plumb and true. Mr. Evans, the inspector reported, saw no problems in the job.

The inspector now, Threlkeld testified, "agreed that drilling would be absolutely the best method to install the piles." He conditioned his agreement, however, upon the grouting of the piling both inside and out, to fill in the space between the 16-inch piles and the 24-inch holes, to which Threlkeld agreed. Also, since the plan involved a change in the contract specifications calling for driving, the inspector required that the plan be submitted for approval to the Coast Guard's "home office," that is, the District contracting officer in Miami. Miami apparently gave its agreement after several days, and the inspector reported that he had "told contractor we will let him drill to installed [sic] 16 inch pipe piles."

Now came the actual drilling. The knoll was a small one, some 50 to 70 feet long, about 18 feet at its widest point and of irregular contour. The distances between the legs of the light —13 feet between adjacent legs and 17 feet diagonally across the square formed by the legs—required that the piling holes be placed close to the sides of the knoll. The drill went into the knoll for the required distance with suspicious speed, and when Threlkeld went down, he saw that the drilling had caved in the side of the knoll. The air pressure behind the drill bit had almost literally blown the knoll apart: "All I could see was a wallowed-out spot in the bottom of the ocean and no hole. This tremendous air pressure that goes into the bit of the drill as it goes around had distributed the whole bottom." The cave-in revealed the spoils bottom: "what had appeared before to be a nice coral head, you know, was nothing but a big pile of boulders."

A second hole was drilled and again the knoll caved in, and "for a large area around the knoll exposed these very large boulders, in no way characteristic of what the bottom appeared." The boulders were so different in height, he said, that the penetration of the two piles varied according to the side of the pile one stood on. On one side, the top of the pile "would come to your waist. If you walked to the other side, you would have to reach up on your tiptoes. It was a matter of which boulder you stood on to touch the top of the pile." The irregular boulders now made the elevation of the knoll vary by as much as 5 feet though the contract drawing had showed only a 1-foot variation in the bottom.

While Threlkeld made efforts to learn the origins of the spoils, the man who had commanded the dredging operation in 1912 was dead and Threlkeld could find no records. Threlkeld believed that coral "heads" which had been blown off and dislodged by the dredging had been dumped at the site of the light, at the edge of the harbor. He was, the Board found, "convinced * * * that the site was a 'pile of boulders' making up a spoil bank resulting from the original dredging of the channel (R–32)". Threlkeld's testimony that the bottom was composed of spoils, and his judgment on their source, was confirmed by other divers.

The situation now presented was in Threlkeld's view an impossible one. In his judgment, drilling for a third pile would only cause another cave-in, and after going through the spoils, the pile would have no more than a foot of penetration into the bottom rock. He asked for new instructions, recommending relocation or re-engineering of the light.

The government inspector refused to recede from the Coast Guard position that the bottom was rock, and cared only about penetration. The inspector, Threlkeld said, "had to go along with the civilian engineer officer who described the knoll as a typical coral reef bottom." It does not appear that the Coast Guard made an underwater inspection of the cave-in to observe the bottom.

The Coast Guard directed that the contractor should "adhere to the method of rebuilding this structure as specified in the contract." Threlkeld could not comply. For the structure to be plumb, the piles would have to be level, and level piles were impossible, aside from penetration of 16-foot piles through the spoils and into the rock for the ten feet required by the contract. The plaintiff demanded corrected engineering and specific instructions on how to proceed, in view of a double changed condition—a bottom differing from the rock bottom shown on the contract drawing to be one foot below the overburden, and a bottom consisting of spoils of rock boulders, unusual in the area. The demand was refused, no further work was done, and the contract was terminated for default.

*The Nature of the Bottom in Fact.* The Board's decision, particularly in determination 1 and findings 12, 13, and 17, *supra,* is fairly to be read as a finding of fact that the bottom was spoils. If the decision were to be read as silent on the subject, the finding would now be made, for the evidence "is of such a nature that as a matter of law the Board could have made only one finding." Maxwell Dynamometer Co. et al. v. United States, 181 Ct.Cl. 607, 631, 386 F.2d 855, 870 (1967). Accord: Ray D. Bolander Co., Inc. v. United States, 186 Ct.Cl. 398, 409, n. 11 (1968); Urban Plumbing & Heating Co. v. United States, 187 Ct.Cl. 15, 24, 408 F.2d 382, 387, petition for cert. filed July 25, 1969, No. 389, Oct. Term 1969.

The government, though it did not at the hearing contest the evidence that the bottom was spoils, now contends that the bottom was, in fact, rock. It relies first upon statements that the bottom was rock, in the daily reports of the government inspector. Such statements were made, both before and after the drilling. On October 23, 1961, the inspector wrote:

Contractor was able to go out side today and drill one (1) hole and place one 16 inch pile. Drilling of hole takes about three (3) hours, the bottom is all rock for the full ten (10) feet of penetration. After the hole is drilled the setting of the pile presents no problem. Pile just fits into hole, with some drive in.

The report is in remarkable contrast to Threlkeld's testimony. On that day, Threlkeld testified, the first hole was drilled in forty-five minutes, which he thought "exceptionally fast." When he went down to see what had happened he saw the cave-in, a "wallowed-out" spot, "no hole" and the boulders. The inspector, who did not testify, recorded a wholly contrary tale, of drilling taking three hours, through solid rock. In the circumstances, the Board gave no credence to the inspector's reports that the bottom was rock, and rightly so.

The government next offers, to show that the bottom was rock, the fact that the surety's contractor finished the job, and that it was accepted by the Coast Guard. The Board in its findings quoted a letter from the contractor to the surety, written upon completion of the light:

28. That Allied Electrical Company, Inc., began work on 2 July 1962 and completed it (except for touch-up painting) on 17 July 1962, reporting to the surety as follows: "The work progressed satisfactorily throughout, the irregular bottom at the site presented no problems of construction other than those normal to this area and the piling were driven to a satisfactory bearing and depth using a 3500 pound drop hammer delivering 500 to 525 blows per pile on a 7 foot drop."

The description of the bottom as "irregular" is consistent with Threlkeld's testimony on the variations in level of the boulders. The completion of the light by driving the piles is further discussed, below, in connection with the Board's findings on drilling and driving.

No doubt has been cast on the great volume of evidence that the bottom was in fact composed of spoils.

*The Representation of the Bottom in the Contract Drawing.* Wheth-

er the contract drawing reasonably indicated the bottom to be rock is a question of interpretation of contract documents and thus a question of law on which this court rules without regard to a board conclusion. United Contractors v. United States, 177 Ct.Cl. 151, 173–174, 368 F.2d 585, 602–603 (1966). There is no reason, however, to differ with the conclusion that the drawing showed "bottom rock" and a "rockline" a foot below the "bottom," and thus indicated that a foot below the overburden the bottom was composed of rock. Finding 17, Determination 1, *supra.*

The govenment contends that because the line showing the rockline is "straight" or "stylized" it is not intended to tell the nature of the bottom. The contention is not elaborated or supported.

The line in question is doubtless straight. It is not otherwise stylized. Above it, on the drawing, is another line, labeled "bottom." That other line, described by the Board as "interrupted stylized" (Finding 17, *supra*) is also straight, and is broken, once, at its center. The drawing further shows the "rockline" to be plus-or-minus 1 foot below the "bottom" line. Testimony that the drawing showed the bottom level to vary by only a foot or to be approximately level may have been based on these features of the drawing.

On the line thus far called the rockline, appears in capital letters the word ROCKLINE. An arrow prefaces the word, pointing left and downward, to and almost touching the line. Under the line, at this point, there is some cross-hatch shading. The reasonably graphic total impression is that solid rock is found at and below the line called ROCKLINE.

It is held that the contract indicated, within the meaning of the changed conditions article, that the bottom was composed of rock.

■ *The Plaintiff's Inspections of the Site.* It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove, as is required to show the changed condition described in the first clause of the article, that he was misled by the contract. Woodcrest Const. Co. v. United States, 187 Ct.Cl. 249, 252–257, 408 F.2d 406, 408–411 (1969); cf. Morrison-Knudsen Co. v. United States, 170 Ct.Cl. 712, 720, 345 F.2d 535, 539–540 (1965); Flippin Materials Co. v. United States, 160 Ct.Cl. 357, 365–367, 312 F.2d 408, 413–415 (1963). Claim to the changed condition in the second clause, an unknown and unusual condition differing from conditions ordinarily encountered and generally recognized, may be made only after a reasonable site investigation, especially where the contract, as here, directs that one to be made. S. T. G. Construction Co. v. United States, 157 Ct.Cl. 409, 415–416 (1962); Perini Corp. v. United States, 180 Ct.Cl. 768, 780, 381 F.2d 403, 410 (1967). See Gaskins, Changed Conditions and Misrepresentation under Government Contracts, in Changes and Changed Conditions, Government Contracts Monographs No. 3, *passim* (1962).

Apparently with these rules in mind, the Board held that the inspection made by the plaintiff barred a claim for a changed condition: "That the Contractor knew from physical inspection what the bottom conditions at Eastern Light were in fact and therefore could not possibly have been misled by Drawing 2774." Determination 2, *supra.*

It is beyond belief that the Board meant what it said—that before the cave-in Threlkeld *knew,* from his two pre-bid underwater inspections, that the bottom was actually spoils. Had actual knowledge been in mind, the decision would have been more appropriate in a finding than in a "determination." All of Threlkeld's testimony, so much relied upon by the Board, bespeaks the sincerity of his belief, until the cave-in, that the bottom was rock. The Board itself, in finding 12, *supra,* dated his conviction that the

bottom was spoils from the time of the drilling operations.

It is equally incredible that the Board meant, and yet did not say, that the inspection made was inadequate or that Threlkeld would have known, from an adequate inspection, that the bottom was spoils. The simple finding was "That the Contractor did perform an underwater inspection of the site before submitting a bid (R–21)." Finding 2, *supra*. No words such as "unreasonable" or "inadequate" appear in the decision.

There would be no support for a finding that the inspection was deficient. Threlkeld, a highly qualified man, made two inspections and each time he saw what appeared to be a "normal coral head," confirming his understanding from the drawing and from widespread knowledge of the ocean bottom of the Florida Keys. After the cave-in, in searching for an explanation of the spoils, it was seen that some of the pipe extended beneath the knoll, and it could be inferred that a barge of pipe had "flipped over" at this point, before the coral boulders were dumped there in the dredging of the harbor. In Threlkeld's pre-bid inspections, however, the debris was in his experienced judgment waste material to be expected on the bottom at the site of a light.

The Board did not say or suggest that the debris put him on notice of the spoils composition of the knoll, or that his inspection was otherwise deficient. Memory had been lost, even for the Coast Guard, of any origin of the knoll in the dredging of the harbor in 1912. There was no reason for him to be on the lookout for an ocean bottom different than that shown by the contract and known to exist throughout the Florida Keys, and he saw nothing to raise any suspicions.

What, then, is the rationalization of the Board's determination that from physical inspection the contractor knew, and therefore could not possibly have been mislead by the drawing. It can be explained only as a ruling of law, appropriate in a "determination," of the legal consequences of the inspection which the contract required the bidder to make "in order to satisfy" himself "as to all local conditions affecting the contract and as to all the detailed requirements of construction." See Finding 1, *supra*. The determination thus meant that the contractor legally and presumedly "knew from physical inspection what the bottom conditions at Eastern Light were in fact and therefore could not possibly have been misled by Drawing 2774." Such a view is erroneous. "The contractual requirement that plaintiff make its own investigation of the site does not obliterate the Changed Conditions clause, nor did this requirement obligate bidders to discover, at their peril, subsurface conditions hidden * * * and thus unavailable to any reasonable pre-award inspection." Farnsworth & Chambers Co. v. United States, 171 Ct.Cl. 30, 35, 346 F.2d 577, 580–581 (1965).

■ Having made a reasonable inspection which gave him no knowledge of the facts, Threlkeld had a right to continue to rely on the drawing and on the general understanding that the ocean bottom was rock. *Ibid.;* Woodcrest Const. Co. v. United States, *supra;* S. T. G. Construction Co. v. United States, *supra;* United Contractors v. United States, *supra,* 177 Ct.Cl. at 159–168, 368 F.2d at 594–599.

*Drilling, Driving and Performance.* The Board went on to hold that the cause of the failure to complete the work was the drilling, for which the plaintiff was responsible. Specifically, it held (1) that had the plaintiff "driven the piling as called for in the specifications," the "bottom conditions encountered would not materially have affected the performance of the contract" (Determination 4, *supra*); (2) that "the decision to drill * * * was the Contractor's" (Determination 3, *supra*); and (3) that the failure to complete the work was due to the plaintiff's "choice" of drilling, "a questionable method of construction, and not to changed bottom conditions" (Determination 5, *supra*).

Had the Piles Been Driven. Had the piles been driven, the knoll would not have caved in. The Board so found (Finding 19, *supra*) on the basis of Threlkeld's testimony that the cave-in was caused by the air pressure involved in drilling: "Had we driven the piles we would never have known this [the spoils nature of the bottom] and would have thought this was a normal coral bottom." It does not, however, follow that the Board was correct in finding that had the piles been driven, and the cave-in avoided, the spoils bottom would "not materially have affected the performance" (Determination 4, *supra*). Neither driving nor drilling could have performed the contract. Driving into a knoll composed of such spoils, Threlkeld testified, would have left the light insecure and in danger of collapse. Moreover, driving into the knoll, before or after it was reduced in height by the two cave-ins, could not have complied with the penetration requirements of the contract.

Had the contract been followed as first written, and the 16-foot piles driven into the knoll, a mound of spoils, the piles would not even have reached the coral bottom. Even with the knoll reduced by the two cave-ins, Threlkeld testified, a third pile would have penetrated no more than one of the ten feet required by the contract. The government's expert, on cross-examination, testified both that he would in a light such as this one want penetration into the natural bottom below any spoils, and that if the piles were driven into a hypothetical 18-foot knoll composed of spoils, much more than the 10 feet of penetration called for by this contract would be needed to reach the underlying rock bottom.

Both the insecurity of the light, had the piles been driven, and the impossibility of achieving the required penetration are supported by the evidence of the completion of the light, by drilling. Threlkeld, who made an underwater inspection of the light after its completion by the surety's contractor, testified that it had been moved 10 or 12 feet and built with a different method of construction, a very heavy template which, he said, did more to support the light than the piles themselves. Despite these changes, the light listed and the 16-foot piles protruded from 4 to 9 feet from the bottom, indicating penetration of from 7 to 12 feet, with an average of 8 feet, less than the Coast Guard had demanded of Threlkeld, not to speak of penetration deep enough to reach 10 feet into the rock. Threlkeld testified that he found, on checking the light with a level, that it listed 7 degrees when he inspected it, and without stating the source of his knowledge, that he understood that it listed 5 degrees when it was first completed.

The government's expert, on cross-examination, testified that "as far as anyone knows at this level" the job was completed by the surety as specified in the original contract, but that he had no information on the subject. The acceptance of the completed job by the Seventh District Coast Guard Contracting Officer as properly constructed was, he said, "sufficient for my purposes." He admitted, however, that it was not proof of 10-foot penetration and that he had no reason to doubt Threlkeld's testimony that the light was built with a different, stronger template and remained where it was because of that template.

The evidence is overwhelmingly to the contrary of the Board's finding that had the piles been driven, the spoils condition of the bottom would not materially have affected performance. The penetration of the rock bottom required by the contract, whether ten feet or an average of ten feet, was impossible through the depth of spoils composing the knoll. The root cause of all the trouble was the spoils bottom, a material changed condition. Given that condition, the contract could not be performed by driving or by drilling.

Was Drilling Questionable or the Best Method. The conclusion that performance was equally impossible by drilling or driving makes relatively un-

important the Board's determination that drilling was a "questionable" method of construction (Determination 5, *supra*). Here, too, however, the Board was unsupported by the substantial evidence, which showed, to the contrary, that in a rock bottom, drilling was not "questionable," and as compared with driving was the better or best method.

The determination that drilling was "questionable" rests on the Board's finding that "drilling was not the usual method R–31". Finding 11, *supra*. First, it is an overlong step from the fact, if it be a fact, that drilling was unusual, to the conclusion that it is questionable. Second, it is not the fact.

The finding that drilling is unusual is based on a misreading of page 31 of the record, cited by the Board as the source for its finding. That page contains a statement by Threlkeld that "We have always used a punch down there," in the Key West area. The government contends that this statement, coupled with understanding that a punch is associated with driving and not with drilling, provides a reasonable basis for the finding that driving was the usual method and drilling unusual.

The contention is based on quotation out of context. At the cited point in the record Threlkeld was describing the drilling, when he was interrupted by a request to "State the experience you had with drilling." His answer, set out in the note,[2] speaks of the hard coral of the Keys; because of the hardness, "You nearly in all instances have to punch before you drive." In the statement in question, "We have always used a punch down there," he was saying that a punch is always used when driving is done, not that a punch is always used or that punching and driving are always done. Any notion that he meant that driving is usual or drilling unusual is dispelled by his description of his experience with both. He said that he had "a good bit of experience with pile driving" in the Keys, and "I have done considerable drilling down there."

The Board gave no other citation than Threlkeld's statement about a punch for the finding that drilling was unusual. In an effort to find other support, the government cites the inspector's negative remarks about drilling, as showing that drilling was unusual or questionable. These remarks were negative, however, only so long as the inspector thought that the cost made the proposal "just talk." When the talk proved to be serious, the inspector approved the plan as the best method, and recommended it to the Coast Guard District office. Next, the government argues that drilling is shown to be unusual or questionable by the fact that the contract specified driving. It might better be said that driving is shown to be unusual or questionable by the readiness of the Coast Guard to change the specifications from driving to drilling. The specification of a construction method is not proof in itself that another method is unusual, questionable or inferior.

The government, finally, seeks to throw doubt on drilling by arguing that the reason that the plaintiff proposed to drill was that he lacked proper equipment to drive the piles. The evidence marshaled in support is (1) the Coast Guard's letter terminating the contract

---

2. "I would like to tell you about the geographical area of the Keys, is just one big coral shelf. I have done considerable drilling down there and I know considerable men who have lost their shirts who did not understand what they are up against. You have a rather hard coral down there. It is not a soft coral. You nearly in all instances have to punch before you drive.

"Anybody down there in the civilian line who put in docks and seawalls and so forth are satisfied with the penetration of four feet on the piles. Usually you work like a devil to get your four feet. The Government always goes for 10 feet.

"We have always used a punch down there. We had one of the biggest and best punches around in the Keys because we had a good bit of experience in pile-driving." R–30–31.

on the ground that plaintiff had demonstrated a lack of competence and equipment necessary to perform the work—evidence only of the fact of the letter and not of the truth of its charges; (2) an anonymous handwritten note to the same effect as the letter, on the margin of a paper in the government's file—evidence of nothing; and (3) the "lack of indication" in any of the inspector's daily reports "of the presence at the site of a pile driver or a pile-driver operator"—evidence that a contractor engaged in drilling does not bring pile-driving equipment to the site.

No evidence of any substance supports the finding that drilling was unusual or questionable. An abundance of evidence supports a contrary finding—that drilling was not questionable; was, because of the tolerance factor, preferable to driving for legs and piles of the dimensions of these; and was the better or best method in the circumstances, a knoll reasonably believed to be composed of rock. It was recommended as the best method by a man of impressive experience. His reasons were convincing, and commended themselves to the inspector, who approved drilling, as "absolutely the best method to install the piles," and to the Coast Guard District office, which also gave its approval.

The Responsibility for Drilling. Finally, though this issue, too, is of little importance, the Board erred in imposing on the contractor alone the responsibility for drilling. In its third determination *supra* it held that the decision to drill instead of driving was the plaintiff's. Twice elsewhere it said that drilling was the plaintiff's "choice." Finding 11, Determination 5, *supra*.

If this decision was one of fact, it was made without supporting substantial evidence and contrary to substantial evidence. The evidence described above shows that there was no "choice" or decision by one person, but a joint decision and agreement. The inspector participated in improving Threlkeld's suggestion, and agreed it was the "best method." The Coast Guard's approval, recorded in the inspector's written report, constituted a change order or a waiver of the contract's requirement of driving.

This latter approval may have been overlooked by the Board, which found that the "Government Inspector approved * * * R–29–30," citing only Threlkeld's testimony, which did not mention the approval of the District office. Finding 11, *supra*. The determination that the decision was the plaintiff's may thus have been a conclusion of law that approval by the inspector, alone, was insufficient to vary the specification, and left responsibility for drilling on the plaintiff. The additional approval of the Coast Guard District office makes the conclusion immaterial and a mistaken basis for decision.

The Board erred, whether in a finding of fact or in a conclusion of law, in holding the plaintiff alone responsible for the decision to drill.

 *Conclusion and Remedies.* Plaintiff's case for a changed condition is complete. The contract drawing showed a rock bottom, the general understanding was that the ocean bottom in the area was rock, and in fact it was spoils. A reasonable pre-bid inspection did not disclose the spoils composition of the bottom. The condition of the bottom prevented performance of the contract, whether by drilling or driving. The Coast Guard was in the wrong in refusing to recognize the changed condition, in not granting extensions of time, and in terminating the contract for default because of the inability to proceed. Such a wrongful termination for default is, of course, a common law breach of contract. Plaintiff is entitled to final, partial summary judgment, in accordance with Rules 64(e) * and 47(c) (2),* adjudicating his right to recover on the issue of breach and liability.

Further proceedings and remedies are governed by the court's recent decision in

* Since September 1, 1969, Rules 101(e) and 131(c) (2).

J. D. Hedin, Const. Co. v. United States, 187 Ct.Cl. 45, 408 F.2d 424 (1969). Plaintiff is entitled "to be liberated from the negative consequences of the default termination—the assessment of liquidated damages and comparable sanctions." *Id.*, 187 Ct.Cl. at 57–58, 408 F.2d at 431. He should therefore have partial summary judgment for the $4,080 assessed against him as liquidated damages in connection with Eastern Light, less $765 already remitted to him (see n. 1, *supra*) on account of the award on the Northwest Light claim.

■■■ Plaintiff is, under the same case, also entitled to the affirmative remedy of common law damages, to be determined in further proceedings in this court, under Rule 47(c).* The termination-for-default clause in the contract is of the old style and does not, by incorporating the clause for termination for the convenience of the government or otherwise, convert an improper default-termination into one for which an administrative remedy is provided under the disputes clause. J. D. Hedin Constr. Co. v. United States, *supra,* 187 Ct.Cl. at 57–58, 408 F.2d at 431–32. Were the new style clause present, it would convert the improper default into an administratively remediable dispute within the jurisdiction of the Board, as in General Builders Supply Co. v. United States, 187 Ct.Cl. 477, 409 F.2d 246 (1969), and the case would be remanded to the Board. As it is, the Board would have no jurisdiction to consider the claim for breach-of-contract damages. The case is thus "an ordinary 'breach' case in which damages (including anticipated profits, if properly proved) are to be shown in judicial proceedings." J. D. Hedin Constr. Co. v. United States *supra,* 187 Ct.Cl. at 59, 408 F.2d at 432. While the proper extension of time is capable of decision by the Board, a remand is unnecessary, since that issue is intimately a part of the issue of breach-damages, to be decided in proceedings which must take place in this court in any event.

*Id.*, 187 Ct.Cl. at 61–62, 408 F.2d at 434.

### Northwest Light Changed Condition Claim

The Board upheld a claim of a changed condition at Northwest Light, and awarded the plaintiff $1,194.48, for the extra costs incurred during the ensuing 51-day delay, and $765, as a remission of the liquidated damages assessed at the rate of $15 per day for the 51 days (n. 1, *supra*).

Plaintiff challenges the award as insufficient and the government counterclaims for the amount of the award, on the ground that the delay was the fault of the contractor.

■■■ *Responsibility for the Delay.* The contract provided for the removal of Northwest Light from its damaged piling, for its repair and for its reinstallation on new piling, using foundation discs removed from the old piles. Two of the three piles parted at the foundation discs while they were being extracted, revealing that the discs had been specially designed for spliced piling and not, as expected by the parties, continuous piling. It is agreed that the spliced piling constituted a changed condition.

There followed a period marked by vacillation and disagreement. Finally, after 51 days, the contractor was given the option to use either new or the old foundation discs, which he had meanwhile salvaged. Using the old discs, he completed the work satisfactorily. An extension of time on account of the changed condition and compensation for lost time were, however, denied. The contracting officer took the position that the differences between the construction details on the plan and those found to exist did not justify an extension of time for completion. The Board held the government chargeable with the 51 days between the discovery of the changed condition and the time the contractor was given the option to rebuild with salvaged discs.

* Since September 1, 1969, Rule 131(c).

The government, admitting the changed condition, argues that the delay was the result of the contractor's own delay and indecision; specifically, that on January 5, 1962, shortly after the discovery of the spliced piling on December 19, the contractor advised that the original discs were not salvageable; that he was then directed to abandon the old discs; and that he nevertheless insisted upon recovering the discs and using them in completing the project.

The matter was not so simple. The record does not confirm that the contractor advised that the discs were not salvageable, but only that he reported that they were designed for spliced piling. The government's direction on about January 5 to abandon the discs was not in writing, and was immediately protested.

Such delay and indecision as took place were more the government's than the plaintiff's. On the discovery of the spliced piling, on December 19, the government refused any departures from the contract, and required that the plaintiff clean the discs to determine their usability, a matter of some time and expense, since they were covered with a 30-year accumulation of marine growth and rust. Then the government at an informal meeting directed that the discs be abandoned. Written instructions were delayed until January 19, and when given were promptly criticized by the contractor, who maintained that it was not practical, as directed, to remove certain rods attached to the discs and to abandon the discs, and that the abandonment of the discs was unnecessary and costly. The discs were in fact salvaged before the government's substitute, supposedly a means of avoiding delay, was delivered. Finally, the government reversed itself and allowed the use of either the salvaged discs or their substitute.

The foregoing is sufficiently substantial evidence in support of the Board's conclusion that the delay was not caused by the contractor, and was thus chargeable to the government. The counterclaim has no merit.

*Plaintiff's Claim of Insufficiency in the Award.* In determining the working days in the 51-day period for which costs were reimbursable, the Board reduced the 51 days to 12, first deducting Sundays and holidays and then deducting 60 percent of the period as an allowance for the time during which bad weather off Key West would have prevented work. Plaintiff's daily costs were found to be $99.54. The award of $1,194.48 is that sum, multiplied by the 12 days. Plaintiff claims error in each step of these findings.

*The Per Diem Costs.* The Board based its findings of per diem costs of $99.54 for Northwest Light on two elements— one, that the repair of Northwest Light accounted for 40 percent of the contract price, and another, that the contractor's daily costs for both lights were $248.88. The finding of $99.54 is the product of these two figures, 40 percent of $248.88. Plaintiff's attack on the finding seems to be no more than an assertion that the correct figure was $248.88, the total contract daily costs. The delay for which costs were awarded was, however, a delay with respect only to the progress of the contractor's work on the Northwest Light. Only costs attributable to that work were lost, and therefore awardable, by reason of the delay.

The Deduction of Sundays. Plaintiff claims that he worked on Sundays, weather permitting, and that the deduction of seven Sundays from the 51-day period was thus without support.

The only evidence on the subject of Sunday as a workday is found in the daily reports of the government inspector. The reason for discrediting those reports on the issue of the rock or spoils nature of the ocean bottom, given above, is inapplicable here, on the issue of the days not worked because of bad weather.

As proof that he worked on Sundays, whenever weather permitted, plaintiff points to several reports of work done on Sundays, on September 3 and 17, October 8 and November 26, 1961, and on February 18, 1962. There are also re-

ports on October 16 and 23, 1961, stating or implying that bad weather prevented work on the prior day, a Sunday. Also of weight is a statement in the report for February 2, 1961, that "Contractor will not be able to work Saturday or Sunday at North West Channel Light." While the reason is not given, the remark lends support to a general practice of work on Sunday, weather permitting. In one case, plaintiff worked on twelve consecutive days, from Monday, September 11, to Friday, September 22, and appears to have stopped then only because the weather "turned bad."

The government responds that whenever plaintiff worked on Sundays he gave his men a compensatory day off in the immediately following week. As proof of such a practice, the government points to days of no work in the weeks following Sunday work on October 8, December 17 and February 18. The first two instances do not prove the point. The days off in the weeks following October 8 and December 17 were due to bad weather, the Christmas holidays or to Threlkeld's absence in Miami to procure additional equipment or confer with the Coast Guard District office. The third instance is the week following Sunday, February 18, which, according to the report, was "a long and hard day." The report on the next day states: "No work today. Contractor said it would be best if he gave his men a rest after a long week and such a long day Sunday. Will go back to work Tuesday (I hope)."

This single instance of a compensatory day off for purposes of rest, following a Sunday of work, is more precisely an instance of a day off following "a long week and such a long day Sunday." Nevertheless, it it some proof of a practice of one day of rest a week, or of a compensatory day off following a day of Sunday work. Plaintiff, on the other hand cannot point to one instance of a Sunday of work followed by six successive days of work.

The evidence is scanty and the question is a close one. If it were to be decided anew, the preponderance is, in my opinion, contrary to the conclusion of the Board, and establishes that the plaintiff worked on Sundays whenever weather permitted; that days off during good weather, for purposes of respite from work, were, because of frequent bad weather, rarely needed, and were taken only following long and hard stretches of work, without relation to days of Sunday work. The evidence to this effect is, however, only a preponderance, and is not of overwhelming quality or weight. There is some evidence to support the Board's conclusion.

 With such a nice balance of evidence, the Board's conclusion lies within the "zone of reasonableness provided by the record," and therefore meets the substantial evidence standard of the Wunderlich Act: Williamsburg Drapery Co. v. United States, 187 Ct.Cl. 298, 303, 407 F.2d 1342, 1344 (1969). An administrative finding may not be disturbed where contrary inferences may be drawn, each is supported by evidence, and the evidence contrary to the administrative conclusion is neither overwhelming in itself nor so detracts from the evidence in support of the finding as to render it less than substantial on the record as a whole. Koppers Co. v. United States, 186 Ct.Cl. 142, 147–154, 405 F.2d 554, 556–559 (1968). The claim of improper deduction of Sundays is not made out, and the finding stands.

The "Bad Weather" Allowance. As noted, the Board also reduced the 51 days by 60 percent, or 30.6 days, as an allowance for bad weather. The underlying finding was that the weather off Key West permitted work during only 40 percent of the period involved.

Plaintiff argues that in making this finding, the Board acted inconsistently with its denial of another claim (now abandoned) for an extension of time because of delays caused by severe weather. That other claim was rejected on findings that there was no evidence that the severe weather off Key West, while it frequently prevented work, was other than normal in the area. The finding

presently under scrutiny is that the generally severe weather was so severe as to permit work only 40 percent of the time. The two findings are not at all inconsistent.

The finding of 40 percent working time was nevertheless without sufficient support in the evidence on which it was based, opinion testimony of the government's expert witness. The expert first testified that "approximately 40 percent of the period [of the contract work] * * * would be working weather offshore." Plaintiff's counsel, attempting to establish the now abandoned claim of delays by bad weather, then pressed the witness to admit that the 40 percent of days of working weather offshore might come after all the work on land had been finished, and thus be unusable. The witness responded that by scheduling work on land during bad weather offshore, a contractor need lose no work time:

> He can expect roughly 40 percent of the overall period of time in which he can work offshore. If he is a good contractor he will arrange the schedule so he can do the offshore work when the weather is good, and when he cannot, he does the shore work.

The Board nevertheless held, unqualifiedly, that only 40 percent of the time was available for any work, offshore or on land. The Board was justified in ignoring the expert's opinion that work on land could always be substituted for offshore work. The witness was as overzealous to defeat the plaintiff's claim of delay by bad weather as he was on Eastern Light matters. The contract required that in approximately 70 days the contractor dismantle two harbor lights, remove paint, repair the structures, repaint, and reinstall the lights on underwater piles in a harbor where rough weather often prevented work. No contractor, however efficient, could schedule painting and repair on land on every day that weather prevented him from working offshore. There would come inevitably the day or days of rough weather, when painting and other on-shore

work was finished or impracticable. The inspector's reports confirm that many of the instances of bad weather meant no work on that day, e. g., on October 16, 1961, "Contractor could not work Saturday or Sunday due to bad weather."

■ Rejection of the opinion that scheduling could avoid any loss of time from weather did not, however, leave the remaining portion of the testimony —that offshore weather would permit offshore work only 40 percent of the time—capable of supporting the finding that bad weather would permit *any* work only 40 percent of the time. Some work on land could certainly be substituted for offshore work prevented by bad weather. Evidence, if it were necessary, was in the record. From the inspector's reports it readily appears, as might have been expected, that on some of the days when bad weather prevented offshore work, Threlkeld substituted repair or painting on land. For example, the inspector's report of October 17, 1961, one of several such reports, states, "Contractor could not go out side today. Seas were 3 to 4 feet. * * * Contractor was working on top section of structure. If this weather keeps up we will start working on the painting."

The cross-the-board finding that weather permitted any work 40 percent, and prevented any work 60 percent, of the time is thus not supported either by the expert's testimony as a whole or by any part of it. The finding is, also, not supported by the inspector's daily reports, the only remaining evidence of weather in the record. The reports show that in a period of 64 days from late August to late October, closely comparable to the intended contract period, rough offshore weather caused a complete stoppage of work on 11 days, or 17.2 percent of the time. (The practice was to make no report on days of bad weather; days for which no report is present are accordingly so treated, unless another reason is stated.)

The Board's finding is thus without the necessary support. A different find-

ing is clearly indicated and should have been made.

It is unnecessary to remand the case to the Board on this issue, becaue the inspector's reports are the only credible evidence remaining in the record, and a finding may be drawn from them on the basis of a day-by-day count. See the cases cited above in the section entitled "The Nature of the Bottom in Fact."

The correct allowance for non-working days by reason of bad weather, to be deducted from the period of delay, is found to be 17.2 percent. How to apply it is raised by the plaintiff's next claim.

 The Alleged Double Deduction for Sundays and Bad Weather. The Board deducted, from the 51 days of delay, nine days, for seven Sundays and two holidays, and 60 percent of the 51 days, or 30.6 days, as the days of no work because of bad weather. Aside from the correct percentage of bad weather, the second deduction inflated the number of days of no work. By deducting one day of every seven for Sundays, and six days of every ten for bad weather, Sunday was deducted and then, again, six-tenths of the same Sunday. Once Sundays and holidays were deducted from the 51 days, further days of no work because of bad weather were properly deductible from the days remaining, and not from the original total of 51.

The Calculation. On the basis of the findings upheld and newly made, the work days for which plaintiff was entitled to reimbursement of his costs are as follows:

51 days—the period of delay 
−9 —7 Sundays and 2 holidays 

42 
−7.22 —17.2 percent of 42 

34.78 —or 35 days of compensable costs 

The Board awarded plaintiff per diem costs for only 12 days. He is entitled to such costs for 23 additional days, which at $99.54 per day amount to $2,289.42.

### Northwest Light Disassembly Claim

Plaintiff claims the costs of extra work in disassembling the superstructure of Northwest Light. The claim is based upon findings that the government inspector unnecessarily required the contractor, in removing the superstructure, to do this work, not specified in the contract.

 While there was testimony sufficient to support the findings, no claim for such costs had been made to the Board. A claim is not made by the giving of testimony which would support a claim. No other evidence of the informal making of a claim is cited. The two findings on the disassembly of the light, on which the claim now made is based, were made by the Board in the course of making detailed findings on the Northwest Light changed conditions claim. From the organization of the Board's opinion and its failure to make a determination or recommendation on the costs of disassembly, it is clear that the Board did not consider a claim for costs of disassembly as having been presented to it for decision.

Under the disputes clause in the contract between the parties, a dispute is to be decided in the first instance by the administrative authorities, and only thereafter may it be presented to this court on a review of the Board's decision. Accordingly, the claim now made for the extra costs of disassembly must be dismissed, for the failure to exhaust available administrative remedies. United States v. Joseph Holpuch Co., 328 U.S. 234, 239–240, 66 S.Ct. 1000, 90 L.Ed. 1192, 106 Ct.Cl. 852 (1946); United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039, 101 Ct.Cl. 870 (1944).

### Northwest Light Priming Claim

 The tower of Northwest Light, was, pursuant to a change order, sandblasted and primed, in preparation for painting. The government offered and paid $325 for this work, which plaintiff

claims is inadequate and less than agreed. The total costs payable were found to be $880, against which the payment of $325 was credited, and plaintiff was awarded $555.

Plaintiff claims that the award is too low. The government claims it is too high. The government did not make such a claim in its answer. Thereafter the government concluded that despite the Board's decision denying the costs of sandblasting, the award includes some costs of sandblasting and also other noncompensable items. Accordingly, the government moved, in its cross-motion, to amend its answer to add a counterclaim for the $555 awarded.

Both claim and counterclaim of errors in the costs awarded are without merit. Accordingly, there is no need to discuss the motion to amend the answer.

These are the errors complained of:

(a) Plaintiff claims that the Board erred in denying the costs of sandblasting, said to be $4,500. The Board found that, at a certain conference, "the Contractor agreed to assume the cost of completely sandblasting the disassembled components of the light tower, and the Contracting Officer agreed to reimburse the Contractor for priming the structure."

Plaintiff relies upon a gentleman's agreement, at the conference, that the costs of sandblasting would be charged as part of the costs of priming. After the conference, however, the plaintiff wrote to the contracting officer, asking for confirmation of the "conclusions" reached at the conference, among them that "The contractor agreed to assume the cost of sandblasting and the Coast Guard agreed to reimburse the Contractor for priming the structure."

Plaintiff admits that the letter, "taken at face value," supports the Board's finding. The letter is sufficiently substantial evidence to support the finding.

(b) The allowance of $330 for two days' rental of a barge, crane and tug was error, the government urges, because they were in any event necessary

to tranport plaintiff's equipment to the job. This is speculation; no evidence is pointed to as showing that the cost allowed was in any event to be incurred.

(c) The award of $50 for "necessary equipment" for two days is said to be too much, because the $325 already paid to plaintiff contained "some such allowance" for equipment. The contention misunderstands the Board's decision. The Board did not make or approve two awards or allowances, for equipment or other items. The $325 already paid was treated by the Board as a credit against the sum of $880 held properly awardable. Only one allowance for equipment was made, $50, and nothing is cited to show that it was excessive.

(d) The government says that the award of labor costs for four days was excessive, because plaintiff in his work schedule estimated that priming would take two days. Such a pre-work estimate is insufficient to overturn the award. The Board stated that its award was based upon cost data furnished by the surety; the data is not mentioned or criticized. Moreover, the criticism of the four days of labor assumes without warrant that because the costs of sandblasting were denied, the award for labor may permissibly cover only two days of actual priming. The four days of labor may represent priming labor for two days and transportation labor for two days. Or priming labor may have been immobilizd for a period or employable for a minimum period of four days.

Plaintiff, too, is dissatisfied with the award for labor, contending that it should have been twelve days, on the basis of the testimony that priming and sandblasting, together, took about ten to twelve days. Since the costs of sandblasting were denied, the evidence of the total labor time required for both priming and sandblasting is not material.

(e) A $100 allowance for an air compressor is said by the government to have been unnecessary, because a compressor is used in sandblasting, and not in priming. The proposition is, appar-

ently, that an air compressor can in no circumstances be involved in priming. No evidence is cited. Even if the proposition seemed entirely free of doubt, it could not be taken as a fact, in the absence of proof. That the award is for costs for two days, the same number as was estimated for the work of priming and was awarded for equipment, is an indication that the Board found that the compressor was used in the priming.

Both claim and counterclaim fail to show that the findings on costs are unsupported by substantial evidence.

*Conclusion*

For the reasons stated:

1. The plaintiffs' motion is allowed in part, defendant's cross-motion correspondingly denied, and partial summary judgment entered

(a) adjudicating that the contract was breached by defendant's termination for an alleged default by plaintiff Vann in performance at Eastern Light, and that the defendant is liable for damages, to be determined in proceedings in this court; and

(b) awarding damages to plaintiff Vann in the sum of $3,315, the net amount assessed against him as liquidated damages, the further damages, if any, to be determined in proceedings under Rule 47(c) [since September 1, 1969, Rule 131(c)], to begin after a period of 90 days.

2. The plaintiffs' motion for summary judgment is further allowed in part, defendant's cross-motion correspondingy denied, and partial summary judgment entered, awarding damages to plaintiff Vann in the sum of $2,289.42, on the Northwest Light changed conditions claim.

3. The defendant's motion to amend its answer to plead an affirmative defense of release and additional counterclaims is granted. The plaintiffs' motion is further allowed in part, defendant's cross-motion correspondingly denied, and partial summary judgment en-

tered striking the defense of release and dismissing all the counterclaims.

4. The plaintiffs are not otherwise entitled to recover. The defendant's cross-motion for summary judgment is allowed in all other respects, plaintiffs' cross-motion correspondingly denied, and partial summary judgment entered dismissing all claims in the petition except as specified in the foregoing.